```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                               )
     United States of America,   )   File No. 19-cr-313
 4                               )              (ECT/TNL)
             Plaintiff,          )
 5                               )
     vs.                         )   Minneapolis, Minnesota
 6                               )   10:34 a.m.
     Santos Gomez Perez,         )   February 3, 2022
 7                               )
             Defendant.          )
 8   ------------------------------------------------------------

 9              BEFORE THE HONORABLE TONY N. LEUNG
10              UNITED STATES MAGISTRATE JUDGE
                    (CRIMINAL MOTION HEARING)
11
     APPEARANCES
12    For the Plaintiff:        United States Attorney's Office
                                Thomas Hollenhorst, AUSA
13                              300 S. 4th Street
                                Suite 600
14                              Minneapolis, Minnesota 55415

15    For the Defendant:        Kevin O'Brien, Esq.
                                Suite 340
16                              7101 York Avenue South
                                Edina, Minnesota 55435
17
      Court Reporter:           Lynne M. Krenz, RMR, CRR, CRC
18                              Suite 146
                                316 North Robert Street
19                              St. Paul, Minnesota 55101

20    Interpreter:              Marianne McEvoy, Spanish

21
          Proceedings recorded by mechanical stenography;
22    transcript produced by computer.

23

24

25
```

1                          **I N D E X**

2
                                                                    PAGE
3
       **SERGEANT RIGOBERTO AGUIRRE**
4          Direct Examination By Mr. Hollenhorst           16
           Cross-Examination By Mr. O'Brien                53
5          Redirect Examination By Mr. Hollenhorst         77
           Recross-Examination By Mr. O'Brien              78
6
       **SANTOS GOMEZ PEREZ**
7          Examination By Mr. O'Brien                       90

8

9
       GOVERNMENT'S EXHIBITS
10         1 and 2                                          18
           3                                                48
11         4                                                52

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E D I N G S**

2                       **IN OPEN COURT**

3          (Defendant present)

4          THE COURT:  Good morning, everyone.  Thank you all

5     for being here.  And we're in a little special arrangement

6     with all the microphones for in-person hearings and so

7     forth.  Thank you all for being here.

8          I would just remind everyone when you're in a

9     speaking role you can take off your mask and if you're not

10     in a speaking role, you know, it would be preferred if you

11     would keep your mask on.

12          And, Madam Interpreter, are you ready to be sworn

13     in?

14          THE INTERPRETER:  Your Honor, I apologize for

15     being late.  I'm so very sorry.

16          THE COURT:  Okay.  I believe there's a saying, Let

17     the person who's not sinned throw the first stone, so I am

18     not throwing any stones.

19          THE INTERPRETER:  Thank you, Judge.

20          THE COURT:  If you could raise your right hand.

21          (WHEREUPON, the interpreter was sworn.)

22          THE INTERPRETER:  I do.  Welcome.

23          THE COURT:  If you could state your full name and

24     slowly spell your last name, please.

25          THE INTERPRETER:  Marianne McEvoy, M-C-E-V-O-Y.

```
 1                    THE COURT:  And are you Court certified?

 2                    THE INTERPRETER:  Yes, I am, Your Honor.

 3                    THE COURT:  Okay.  Thank you very much.

 4                    And I will go ahead then and formally call the

 5       case.

 6                    This is the United States District Court for the

 7       District of Minnesota and the case before the bench is

 8       captioned as follows:  United States of America versus

 9       Santos Gomez Perez.  It is Case Number 20-cr-313 (sic).

10                    Starting with Mr. Hollenhorst, please identify

11       yourself for the record.

12                    MR. HOLLENHORST:  Good morning, Your Honor.  Tom

13       Hollenhorst for the United States.

14                    THE COURT:  Nice to see you.  And Mr. O'Brien for

15       defense.

16                    MR. O'BRIEN:  Good morning, Your Honor.  Kevin

17       O'Brien for the defendant and I think we can refer to him as

18       Mr. Gomez.

19                    THE COURT:  Thank you.  And nice to see you, Mr.

20       O'Brien.

21                    Okay.  In light of COVID and in the interests of

22       health again, I'd just ask that maybe you just speak from

23       your seated positions as opposed to the tradition of going

24       to the center podium and wear your masks unless you're in

25       interactive role.
```

1                    And here's the funniest part, I always love to

2          say, and after you're done please wipe off -- clean your

3          spots.

4                    So, Mr. Gomez, good morning.

5                    THE DEFENDANT:  Good morning, Your Honor.

6                    THE COURT:  Are you and the interpreter hearing

7          okay?

8                    THE DEFENDANT:  Kind of low.  That's kind of

9          quiet.  I tried to turn the volume up, but --

10                   THE COURT:  Is that better?  Is that a little

11         better?

12                   THE DEFENDANT:  Yes.  Yes.  Now it's good.

13                   THE COURT:  Do you want to try another headset or

14         are you okay?

15                   THE DEFENDANT:  I would like to just to make sure

16         it's clear.

17                   That's better.

18                   THE INTERPRETER:  So he's saying that it seems all

19         right now.  I think maybe the problem was when we tested it

20         out I was a talking a little more loudly but then once the

21         hearing started I have to talk more quietly.  So that might

22         have been part of it.

23                   (Off-the-record discussion.)

24                   THE INTERPRETER:  It seems to be fine now, Your

25         Honor.

1          THE COURT:  Is that other headset such that you

2     think we should try to replace it?

3          THE INTERPRETER:  Well, it wasn't the headset it

4     was the different receiver.  This one is the one that seemed

5     to be problematic because he's actually using the same

6     actual headset that he had before.  So maybe --

7          THE COURT:  So I wonder if we should mark that

8     one?

9          THE INTERPRETER:  Maybe it's like low on

10    batteries.

11         THE CLERK:  It looks like --

12         THE COURT:  Otherwise I don't want to have to do

13    this every hearing.  That's fine we get this covered but it

14    would be nice to get that fixed.

15         Okay.  You good, Mr. Gomez?

16         THE DEFENDANT:  Yes.  I can hear fine.

17         THE COURT:  Okay.  Very well.

18         Counsel, what I'll do is I'll go through the ECF

19    numbers at first and then we'll proceed with whatever

20    litigation you folks want.

21         And so let's just go with ECF Number 9,

22    government's motion for discovery.

23         Putting expert discovery aside for the moment, is

24    there any objection to the government's request?

25         MR. O'BRIEN:  No, Your Honor.

1          THE COURT:  Okay.

2          Turning now to the expert discovery.  The

3    government has proposed 30 days before trial for its typical

4    expert disclosures and 10 days before trial for rebuttal

5    experts.

6          Defendant has generally asked for expert discovery

7    under Rule 16.  Is there an agreement on time for

8    disclosure?

9          MR. O'BRIEN:  What you must mentioned is agreeable

10   to the defense.

11         MR. HOLLENHORST:  Agreeable to the government,

12   Your Honor.

13         THE COURT:  All right.  Anything further on that

14   one?

15         MR. O'BRIEN:  No, Your Honor.

16         MR. HOLLENHORST:  No, Your Honor.

17         THE COURT:  Okay.  Move on to 48, defendant's

18   motion for production of *Brady* material.  Anything further

19   on this one?

20         MR. O'BRIEN:  No, Your Honor.

21         MR. HOLLENHORST:  Nothing more, Your Honor.

22         THE COURT:  49 is defendant's motion for retention

23   of rough notes.  Anything?

24         MR. HOLLENHORST:  No, Your Honor.

25         MR. O'BRIEN:  No, Your Honor.

1          THE COURT:  50 is defendant's motion for

2     disclosure of 404(b) evidence.

3          Government has proposed disclosure of any 404(b)

4     evidence in three of trial -- or three weeks before trial.

5     Any agreement on this one?

6          MR. O'BRIEN:  That's fine with the defense.

7          THE COURT:  51 is defendant's motion for

8     discovery.

9          Defendant requested production of his original

10    Spanish language statement taken on March 15, 2019, by

11    Sergeant Aguirre and Deputy Ferrian of the Ramsey County

12    Jail.

13          Based on the government's responses I think this

14    has happened now, but I'm not sure.

15          MR. O'BRIEN:  Yes.  Yes, Your Honor.  The

16    government has produced the original Spanish statement, but

17    I would -- and I note that the government is still waiting

18    for the translation of that statement into English and I

19    assume that the government will get that to me a couple

20    weeks before trial.

21          THE COURT:  Just for the Court's clarification.

22          So you actually have the original in Spanish and

23    you're waiting for an official translation, is that --

24          MR. O'BRIEN:  Yes.

25          MR. HOLLENHORST:  Yes, Your Honor.  If I might say

 1    a few words on that.

 2              Government Exhibit 4 is, in fact, the Spanish

 3    statement of the defendant, which has been provided to the

 4    Court and counsel.  And it's not of much use to the Court

 5    right now, however, I don't think the substance of the

 6    defendant's statement is at issue here and I don't think the

 7    Court will need a transcript.  However, once we get one we

 8    will certainly forward it to the Court if the Court wishes

 9    to have that.

10              THE COURT:  So your belief is my high school

11    Spanish will not suffice?

12              MR. HOLLENHORST:  Nor mine.

13              THE COURT:  I wouldn't surprise me.

14              You're more proficient, aren't you?

15              MR. O'BRIEN:  I heard it.  I listened to it.  I

16    understood.

17              THE COURT:  Yeah, that's very helpful.  Thank you.

18              MR. O'BRIEN:  Thank you.

19              THE COURT:  Again, I'm glad it's a lot better than

20    my high school Spanish.

21              Anything else on this one?

22              MR. HOLLENHORST:  No, Your Honor.

23              MR. O'BRIEN:  Just, Your Honor, on the chance that

24    the government has put in some body cams of police officers,

25    we'd like to receive that.

1          MR. HOLLENHORST:  Your Honor, I did learn today

2    that there might be some body cam footage so we'll look into

3    that and properly disclose that to the defense.

4          There is no video that I'm aware of that pertains

5    to the substance of this motion -- of these motions,

6    however.

7          THE COURT:  Okay.

8          MR. HOLLENHORST:  So it's more of a production of

9    evidence issue.

10          THE INTERPRETER:  Sorry.  The interpreter is

11    having a little trouble understanding the prosecutor.

12    Maybe -- Mr. Hollenhorst, yes, closer to the microphone.

13          MR. HOLLENHORST:  Should I --

14          THE INTERPRETER:  Please repeat that last

15    comment.

16          MR. HOLLENHORST:  Yes.  I was just saying -- if I

17    could remember what I just said.

18          We don't feel that any body cam footage is germane

19    to this hearing, to these motions, but we would endeavor to

20    produce the body cam footage forthwith.

21          THE COURT:  So is it safe to say government may

22    have body cam footage and if it does it will produce to

23    defense timely?

24          MR. HOLLENHORST:  Right.  And I believe that there

25    is body cam footage of the police when they first entered

 1    the property at issue here, 4056 Washington Avenue North,

 2    but we do not believe there's any body cam footage that is

 3    germane to the defendant's motions.  That is the statement

 4    made by the defendant at the scene.

 5              THE COURT:  Okay.  Very well.

 6              Anything else for the record on that, Mr. O'Brien?

 7              MR. O'BRIEN:  Your Honor, I would request that if

 8    it turns out that there's a colorable argument that that

 9    footage does affect the motions hearing that we'd be allowed

10    to reopen.

11              THE COURT:  Sure.  Yep.  If a thought occurs at

12    that time, obviously, you know, take the proper procedures

13    to do that and the Court will be more than happy to consider

14    whatever the additional information and/or arguments are.

15              MR. O'BRIEN:  Thank you.

16              THE COURT:  Okay.  ECF 52.  Defendant's motion for

17    suppression of evidence and seizure -- search and seizure.

18              My understanding is that there are two searches at

19    issue, both of them taking place on March 14, 2019, at

20    Olympic Auto Center.  Is that correct, folks?

21              MR. HOLLENHORST:  Yes, Your Honor.

22              And Government's Exhibit 1 and 2 are the warrants

23    at issue and we would offer them into evidence at this time.

24              THE COURT:  First of all, are those the -- with

25    respect to the search and seizure, is that right?  It's

1    those two from that day?

2              MR. O'BRIEN:  That's right, Your Honor.

3              THE COURT:  And then it sounded like the second

4    search arises -- basically rises and falls with the first

5    one.  Is that proper understanding?

6              MR. O'BRIEN:  Yes, Your Honor.

7              MR. HOLLENHORST:  Your Honor, of course that --

8    the government doesn't concede that the second one was the

9    fruit of the poisonous tree and will present some evidence

10   as to why we believe that.  We also have a standing

11   argument.

12             THE COURT:  Sure.  And I understand the government

13   might have a number of different positions.  I just want --

14   I was trying to clarify my understanding was, basically, I

15   mean if, you know, basically the first one is good or bad,

16   the second one sort of rises and falls with it.

17             Okay.  And that sounds like the case, obviously

18   subject to whatever additional arguments folks have.

19             Okay.  Is this a four corners review?

20             MR. HOLLENHORST:  Yes, Your Honor.  With the

21   caveat that -- which I've already said, and I don't mean to

22   belabor this point, but the government's going to take the

23   position also that there's no standing to contest these

24   warrants in the first place.

25             And then, secondly, that -- let's see, what is the

1    second?  Oh, we do have an independent basis for the seizure

2    of the firearms, which we will be arguing and briefing.

3                    THE COURT:  Okay.  Mr. O'Brien?

4                    MR. O'BRIEN:  Well, Your Honor, I'm not sure it's

5    simply a four corners argument.

6                    The argument for the defense is that the first

7    search was for two tracking devices and law enforcement

8    exceeded the scope of that search.

9                    And the second search on that day was based on a

10   warrant for the firearms.

11                   THE COURT:  So exceeded the scope of the warrant

12   itself?

13                   MR. O'BRIEN:  Yes.

14                   THE COURT:  Okay.  Thanks.

15                   Anything else on that, Mr. Hollenhorst, other than

16   litigation?

17                   MR. HOLLENHORST:  No, Your Honor.

18                   THE COURT:  Okay.  ECF 53, defendant's motion for

19   suppression of statements.

20                   My understanding from the papers is that this is

21   the motion we will be litigating today and whatever may

22   additionally need to be explored with respect, I suppose, to

23   52, based on whatever.  But primarily it seems like that's

24   why we have an officer here.

25                   And to confirm, there are two statements at issue,

1    one March 14, 2019, statement taken at Olympic Auto Center.

2    And, two, the March 15, 2019, statement taken at the Ramsey

3    County Jail.

4              Is that a correct understanding of defense?

5              MR. O'BRIEN:  It is, Your Honor.

6              And to provide a little more detail.  The first

7    statement was not accompanied by a *Miranda* warning.  The

8    second was -- or was prefaced by a *Miranda* warning.

9              (Off-the-record discussion.)

10             THE INTERPRETER:  Sorry, Your Honor.  My client

11   just wanted to make sure my mouth was closer to the

12   microphone.

13             (Off-the-record discussion.)

14             THE DEFENDANT:  Okay.  I can hear clearly now,

15   sorry.

16             THE COURT:  Okay.  Very well.  Thank you.

17             Anything else on that point, basically just

18   setting the table a little bit?

19             MR. HOLLENHORST:  Nothing more, Your Honor.

20             THE COURT:  Okay.

21             Finally, I believe we may have covered this

22   earlier but to the extent that defendant asserted at the

23   time of filing that he did not receive the recording of the

24   March 15th statement, that recording has since been

25   provided?  All right.

1          MR. O'BRIEN:  Correct.

2          THE COURT:  That's it.  Other than that then I

3    think we're ready to proceed with next part of this hearing.

4          Government, your case?

5          MR. HOLLENHORST:  Thank you, Your Honor.

6          Your Honor, the government calls Sergeant

7    Rigoberto Aguirre.

8          THE INTERPRETER:  The interpreter did not hear the

9    name of the officer.  I apologize.

10          MR. HOLLENHORST:  Rigoberto Aguirre.  And the

11    witness will be spelling his name.

12          THE COURT:  Okay.  Fair enough.

13          THE INTERPRETER:  Your Honor, would the Court mind

14    if the interpreter sat over there in order to be able to see

15    and hear the witness better?

16          THE COURT:  You can feel free to go wherever you

17    want, other than you can't sit here.

18          Okay.  Sergeant, if you could raise your right

19    hand.

20          Do you swear to tell the truth, the whole truth

21    and nothing but the truth, sir?

22          THE WITNESS:  I do.

23          THE COURT:  And, sir, if you could state your full

24    name and spell it slowly for the record.

25          THE WITNESS:  Sergeant Rigo Aguirre.  R-I-G-O.

1     Last name is A-G-U-I-R-R-E.

2             THE COURT:  Okay.  And, Sergeant Aguirre, did you

3     bring any notes up with you here today?

4             THE WITNESS:  Yeah.  Copies of the report.

5             THE COURT:  Okay.  You're free to refer to that to

6     refresh your recollection but when you do could you, as a

7     courtesy to everyone in the courtroom, just let us know that

8     so that we understand what you're doing on that?

9             THE WITNESS:  I understand that.

10            THE COURT:  With that, please proceed, counsel.

11            MR. HOLLENHORST:  Thank you.

12                    **(Sergeant Rigoberto Aguirre)**

13                         **DIRECT EXAMINATION**

14    BY MR. HOLLENHORST:

15    Q.  Since I mentioned your name for the record, could you us

16    your full name, first full name?

17    A.  Rigoberto.  R-I-G-O-B-E-R-T-O.

18    Q.  Thank you.  Sergeant, where do you work?

19    A.  St. Paul Police Department.

20    Q.  And how long have you worked there?

21    A.  About 18 years -- 17 years.

22    Q.  What's the current nature of your duties?

23    A.  My current assignment is I'm the executive sergeant to

24    the assistant chief of police.

25    Q.  All right.  On March 14, 2019, what was your duty

1    capacity at that time?

2    A.  I was assigned to the narcotics unit for the St. Paul

3    Police Department as a supervisor.

4    Q.  In connection with your supervisory duties on that date,

5    March 19th, 2019, did you participate in the search of a

6    premises?

7    A.  I did.

8    Q.  And where was that?

9    A.  That was in Minneapolis at 456 Washington Avenue.

10   Q.  Okay.  And it was 456 Washington Avenue North

11   Minneapolis, Minnesota?

12   A.  That is correct.

13   Q.  And that also is the address of a business that was

14   located there, right?

15   A.  Correct.

16   Q.  And what was that business name?

17   A.  I believe it was called Olympic Auto.

18   Q.  Say Olympic Auto Center?

19   A.  Yes.

20   Q.  All right.  So Government Exhibit 1, which has already

21   been accepted into evidence, was a search warrant for two

22   tracking devices, is that right?

23   A.  Correct.

24   Q.  Could you just --

25              THE COURT:  Counsel, I don't know if I formally

1    accepted anything, so.

2              MR. HOLLENHORST:  Okay.  I will offer Government's

3    Exhibit 1 and 2 at this time.

4              MR. O'BRIEN:  No objection.

5              THE COURT:  Court receives Government's Exhibit 1

6    and 2.

7    BY MR. HOLLENHORST:

8    Q.  So Government Exhibit 1 was not prepared by you but you

9    know now that it was a warrant for tracking devices, is that

10   right?

11   A.  Yes.

12   Q.  Could you just very briefly describe why the police were

13   looking for tracking devices?

14   A.  Tracking devices were placed on two vehicles.  Those two

15   tracking devices disappeared.  Those believed off the

16   vehicles at this location.

17   Q.  Okay.  And police actually were still getting signals

18   from these devices which tracked back to this address we

19   just talked about, right?

20   A.  I don't remember if the devices were live giving that

21   address or if that was the last location they were at.

22   Q.  Okay.  Could you describe the size and shape of a

23   tracking device typically used in these cases?

24   A.  Yep.  They're all different sizes but these particular

25   devices that we used that day were rectangular-shaped.

1    They're probably 5 inches by 4 inches, maybe 2 inches

2    thick.  They have magnets on them.  It just looks like a

3    black box.

4    Q.  Okay.  And so it's certainly small enough to fit into a

5    metal filing cabinet or some other type of cabinet?

6    A.  Yes.

7    Q.  Okay.  The search warrant authorizes the search of these

8    premises to find those items, right?

9    A.  Correct.

10   Q.  And so would it be reasonable to say that the police

11   were authorized to look in cabinets for these devices?

12   A.  Yes.

13   Q.  Were the devices ever recovered?

14   A.  I don't believe so.

15   Q.  Was -- so why don't you describe then the setting of

16   this address when you arrived there.  How many police were

17   there and how many people were at the premises?

18   A.  So I'd have to count the number of --

19   Q.  Roughly.

20   A.  -- people that were there but about ten officers.  I

21   believe there was about three people inside this business.

22   It's a big building with the target address or the Olympic

23   Auto Center was at the far end of when you come into the --

24   I don't remember if that was the south or north end, but it

25   was the far end.

1     Q.  Is your microphone on?

2               THE COURT:  Mr. Hollenhorst?

3               MR. HOLLENHORST:  Yes.

4               THE COURT:  Could you -- again, I think you're

5     doing it now, but you're going to develop a little layout of

6     the place for me --

7               MR. HOLLENHORST:  Yes.  Yes.

8               THE COURT:  -- location?  If there's going to be a

9     file cabinet involved --

10              MR. HOLLENHORST:  Right.

11              THE COURT:  -- where that is.

12              MR. HOLLENHORST:  Right.

13              THE COURT:  And, you know, what did it appear to

14    be involved in, you know.

15              MR. HOLLENHORST:  Mm-hmm.

16              That's what we're going to do, Your Honor.

17              THE COURT:  All right.  Thank you.

18              MR. HOLLENHORST:  Okay.

19              THE COURT:  Just want to make sure.

20              MR. HOLLENHORST:  Okay.

21    BY MR. HOLLENHORST:

22    Q.  I want to just make sure that your microphone is on.

23    I'm having trouble hearing you.

24              THE INTERPRETER:  The interpreter is also having

25    trouble.  It doesn't seem like that microphone is working at

1    all.

2              THE WITNESS:  Test, test, test.

3              MR. HOLLENHORST:  That's better.

4              (Off-the-record discussion.)

5              THE WITNESS:  Test, test, test.

6              MR. HOLLENHORST:  All right.  May I continue, Your

7    Honor.

8              THE COURT:  Yes.  You may.

9              MR. HOLLENHORST:  Thank you.

10   BY MR. HOLLENHORST:

11   Q.  All right.  So as you arrived then describe the setting.

12   Describe this place that was being searched?

13   A.  So the garage or the set area we're searching is a

14   portion of a bigger building --

15             (Court reporter interrupted.)

16   A.  The building we were searching is in sections so the

17   portion we were searching has its own front door.  It's a

18   garage open area.

19             When you first walk in the door there's a small

20   lobby that you can walk through.  I would estimate it's no

21   bigger than 14x14 and there is a bathroom, if I recall.  And

22   then there's a door to go into the main, like, garage area.

23   And this is a big garage, open area, holds, I want to guess

24   somewhere in the area of 10, 15 cars.

25   Q.  Okay.  And every one of these places I've been into have

1    these wells and then lifts for cars, is that right?

2    A.  Correct.  I don't remember exactly how many lifts or

3    those types of things there are, but there's tools in there,

4    there was cabinets, it was -- it was a little bit overrun by

5    vehicles and gear and everything.

6    Q.  How many vehicles do you think were in there?

7    A.  I'm going to guess there was around eight vehicles in

8    there at the time.

9    Q.  Okay.  Pretty large area then?

10   A.  Yes.

11   Q.  And you surmised from what you saw that this was a

12   business engaged in auto repair?

13   A.  Auto repair, auto body, yes.

14   Q.  Okay.  Now, were there any filing cabinets or other

15   types of containers along the walls or in the center area of

16   this place?

17   A.  Yes.  There was various cabinets, containers, boxes of

18   all sorts all over.

19   Q.  Okay.  We're going to be talking about a specific

20   cabinet later on.  Why don't you describe where that one was

21   on?

22   A.  So if I remember correctly, that was roughly in the

23   middle of garage.

24   Q.  Okay.  Middle, what do you mean by that?  In the center?

25   A.  In the center of the garage.

1    Q.  So it wasn't hooked to a wall?

2    A.  Not that I recall.

3    Q.  Okay.  And it was -- describe the cabinet.

4    A.  I don't have information on the cabinet.  I wasn't the

5    person who found anything in the cabinet.

6    Q.  Okay.  You were there when the items were found, though,

7    right?

8    A.  I was in the building, yes.

9    Q.  Okay.  Well, we'll get to that later during your

10   testimony.

11           When you entered -- when the police entered the

12   facility, what happened?

13   A.  Announcements were made that the police were there for a

14   search warrant.  Officers went inside.  Two people were

15   located right away.  I'm not sure if they were in the lobby

16   or coming out of the front doors.  And then one person -- at

17   least one person was inside in the garage.

18   Q.  Was one of the people that you're talking about the

19   defendant?

20   A.  Yes.

21   Q.  And do you see him in the courtroom today?

22   A.  I do.

23   Q.  Could you identify him for the record?

24   A.  Yep.  As I recall, Perez Gomez Santos, sitting in the

25   orange uniform wearing a hat to my left.

1          MR. HOLLENHORST:  Your Honor, may the record

2     reflect the witness has identified defendant Santos Gomez

3     Perez.

4          MR. O'BRIEN:  No objection.

5          THE COURT:  Record will so reflect.

6     BY MR. HOLLENHORST:

7     Q.  Where was Mr. Gomez at the time that you entered?

8     A.  I believe he was one of the first people there.  So he

9     was -- he was right at the entrance to the building and was

10    kept there while we made entry.

11    Q.  All right.  Now you say kept there.  Is it true then

12    that all three of these men, and you believe there were

13    three, were handcuffed, right?

14    A.  Yes.

15    Q.  Why did you do that?

16    A.  Various reasons.  Officer safety.  It's a big area,

17    which all relates to officer safety.

18          Also, just as general protocol when you go into a

19    search warrant like this, big open area, we detain everybody

20    in there.

21    Q.  And in the spirit of full disclosure, Mr. Gomez was also

22    suspected of having engaged in some drug trafficking prior

23    to this, is that right?

24    A.  That is correct.

25    Q.  Okay.  And so I think we will concede for the record

1    that Mr. Gomez was essentially detained and in custody at

2    the time of further activities there, right?

3    A.  Yes.

4    Q.  Okay.  So let's get to that.  Did you see the police

5    officers looking around for these tracking devices?

6    A.  Yes.

7    Q.  Where were they looking?

8    A.  Everywhere.  We spread out.  We tried to be methodical

9    on the search.

10   Q.  Were some of the places they were looking cabinets?

11   A.  Yes.

12   Q.  And boxes?

13   A.  Yes.

14   Q.  Other containers you described?

15   A.  Anywhere that that tracking device would fit.

16   Q.  Okay.  At some point did an officer approach you and ask

17   you to do something?

18   A.  I was informed that the defendant wanted to speak with

19   me.

20   Q.  Okay.  What happened in response?

21   A.  I went -- met with the defendant and spoke to him inside

22   the garage.

23   Q.  So at this time was the defendant standing, sitting --

24   A.  Standing in handcuffs.

25   Q.  Okay.  Were there any other forms of restraint?

1    A.  No.

2    Q.  Did the police officers have weapons drawn?

3    A.  Not at this time.

4    Q.  Okay.  But there were uniformed officers presumably with

5    firearms?

6    A.  Officers with firearms wearing vests that identify them

7    as police.

8    Q.  Okay.  And conceding that that could be argued as a

9    coercive setting, other than that were there any -- did you

10   pressure the defendant into doing anything that day?

11   A.  No.

12   Q.  So you say then that he first wanted to talk to you, is

13   that right?

14   A.  That is correct.

15   Q.  Okay.  What happened when you approached him?

16   A.  So I approach him and from my memory and from some notes

17   that I have in my report he wanted to -- an opportunity to

18   get out of trouble.

19        This is very common in my line of work that

20   someone may want to trade information in exchange for some

21   kind of a prosecutorial help or just not being arrested that

22   particular day.

23   Q.  Okay.  And to your knowledge was he aware at this time

24   that he had been arrested?

25   A.  Yes.

```
 1    Q.  Okay.  For what?

 2    A.  The narcotics.

 3    Q.  Okay.  So in your view then that was partly why he

 4    wanted to talk?

 5    A.  It could have been.

 6    Q.  Okay.  But you don't know for sure?

 7    A.  I don't know for sure.

 8    Q.  Okay.  Prior to that statement that he made, had you

 9    questioned him in any way?

10    A.  No.

11    Q.  Had any other officers, to your knowledge, questioned

12    him?

13    A.  Not that I know of, but I don't believe so.

14    Q.  Okay.  So now we have to get into the nitty gritty of

15    what was said.  So why don't you describe to the Court how

16    the conversation proceeded?

17    A.  Yep.  So, as I said, very typical in my line of work

18    that a defendant may want to offer information in exchange

19    for something, which is what I believed was going to happen.

20    The defendant wanted an opportunity to get, I don't know, to

21    get out of trouble, basically.

22            He told me that he knew of a place, and not this

23    garage, that had a -- various amounts of firearms that were

24    delivered to him that were supposed to be transported or, I

25    guess, concealed and taken over to Mexico and he wanted to
```

1      give that information and help us by getting a phone call

2      and leading us to those firearms, which we would assume

3      would be illegal firearms and at least they were going to be

4      transferred out of the country into Mexico.

5      Q.  Okay.  So now all this was said and done -- or said when

6      the officers were still in the process of looking for these

7      tracking devices?

8      A.  That is correct.

9      Q.  And what time of day, roughly, was this?

10     A.  It's about midday.  About 1:00, 1:30, if I recall.

11     Q.  Okay.  All right.  And so the defendant said that there

12     were weapons that had been delivered to him, is that right?

13     A.  That's correct.

14     Q.  And that they were at some other location?

15     A.  That is correct.

16     Q.  And that these weapons were going to be transported

17     across the border into Mexico?

18     A.  Yes.

19     Q.  And you suspected then that these weapons were illegal?

20     A.  Correct.

21     Q.  Okay.  What happened -- now, up to this point, had you

22     asked him any questions, the defendant?

23     A.  Anything I asked him was in relation to where is the --

24     for example, what location are they at?  Just trying to get

25     more of a sense of --

 1    Q.  Okay.

 2    A.  -- of what information he's really trying to provide.

 3    Q.  Okay.  But we have to fine-tune this.

 4    A.  Yes.

 5    Q.  Because once you start asking questions arguably it's an

 6    interrogation, right?

 7         So when he told you that he wanted to talk to you,

 8    what was your response?

 9    A.  So when he originally wanted to talk to me --

10    Q.  Right.

11    A.  -- that's when I approached him to see what he had to

12    say.

13    Q.  Okay.  And then did you ask him any questions before he

14    started speaking?

15    A.  No.  He was -- it was clear to me when I approached he

16    wanted to offer information.

17    Q.  And then he offered this information without any

18    questioning on your part?

19    A.  Correct.

20    Q.  Now, after he had --

21         THE COURT:  In what language was this?

22         MR. HOLLENHORST:  Thank you, Your Honor.

23    A.  This was all conducted in Spanish.

24    BY MR. HOLLENHORST:

25    Q.  Okay.  And I want to lay a little foundation on that.

1     Do you speak Spanish?

2     A.  I do.

3     Q.  How did you learn Spanish?

4     A.  From my parents.  They are native Spanish speakers from

5     Mexico.

6     Q.  Okay.  And did you grow up speaking Spanish?

7     A.  I did.

8     Q.  Do you consider yourself to be fluent in the Spanish

9     language?

10    A.  I do.

11    Q.  Both written and vocal?

12    A.  I'm very better at vocal.

13    Q.  Okay.  All right.  So all this conversation we're

14    talking was in the Spanish language then?

15    A.  Yes.

16    Q.  And do you feel like you clearly understood what the

17    defendant was saying to you?

18    A.  Yes.

19    Q.  And what you're doing now is basically providing a

20    translation of the conversation, is that right?

21    A.  Correct.

22    Q.  So what you said he said, up to this point there were no

23    questions that had been asked of him --

24    A.  About --

25    Q.  -- to your knowledge?

1    A.  -- the criminal activity?  If that's what you're asking,

2    no.

3    Q.  Okay.  So also any kind of question -- or any behavior

4    on your part that tends to elicit a response could arguably

5    be considered a question.  Any of that going on?

6    A.  So I should be very clear, in these situations when

7    someone provides information because they want to trade it

8    for something they will give us like a story or some

9    information.  Those stories have to be vetted before we do

10   anything with them.

11        So if you say that there are weapons then I would

12   logically want to know are we talking about in the city, in

13   the state, in this country.  So things of that nature.

14   Q.  Okay.  Well, we'll get to that.

15   A.  Okay.

16   Q.  But this first pronouncement by the defendant was done

17   without questioning, is that right?

18   A.  That's correct.

19   Q.  Okay.  So then what happened next?

20   A.  After we were done speaking --

21   Q.  No.  Because -- how long did the conversation last?

22   A.  I'm just going to guess here maybe two to three minutes.

23   Q.  Okay.  So at some point I inferred from your answer that

24   you did ask him a question or two, for example, Where are

25   these weapons?

1    A.  Yes.

2    Q.  Okay.  So there was some questioning on your part after

3    the defendant's initial statement?

4    A.  Yes.  From what he told me we would clarify what he's

5    saying, yes.

6    Q.  Okay.  Why don't you then do the best you can as to

7    reconstructing this conversation at the point where he had

8    already stated what you testified to?

9    A.  Okay.  So he would have offered information on --

10   Q.  And not would have, what he did.

11   A.  He offered information about potential criminal

12   activity, which was firearms.  That he knew of their

13   location and that they were going to be transported --

14   transported somewhere.

15          I asked him followup questions to clarify where

16   they're going to be transported, in which he indicated

17   Mexico and I think -- no, I'm sorry.  He did say Mexico.

18   And I asked him where they were at, he said another

19   location.  He also -- I asked him if they were close.

20   That's about all I remember from the location portion.

21          But I was -- my intent was to clarify how far away

22   are we talking about, if this is going to be within my

23   jurisdiction or not really is what it comes down to.

24          And at that point he also mentioned that he needed

25   to receive a phone call from Mexico, specifically from

 1    Guadalajara.  And I believe that's to the extent -- I
 2    understood at this point he may have some information, and
 3    we can get into more specifics later, but at the time I was
 4    thinking we could get into more specifics later but he had
 5    laid down the groundwork of what it is he has access to that
 6    we may be interested in.
 7    Q.  So we didn't have a recording of this conversation.
 8    A.  That is correct.
 9    Q.  And you did not have your video cam activated at this
10    point?
11    A.  That is correct.
12    Q.  And so the -- what was -- I know that intent sometimes
13    isn't intent relevant here but what was your intent at the
14    time of standing across from him listening to what he had to
15    say?
16    A.  As an investigator investigating narcotics, firearms,
17    all kinds of violent crimes, we're always trying to improve
18    our investigations by going up the ladder.
19         So if you have the opportunity to, let's say get a
20    street level dealer we would want to know who's providing
21    that source of illegal drugs and move up and so forth.
22         So, in this case, if he was, as we were looking
23    for trackers and he's offering me now the possibility of
24    getting guns, that is much more attractive to us as an
25    organization.

1    Q.  Okay.  So at the time of the conversation you weren't --

2    is it true that you were not investigating the defendant for

3    firearms trafficking?

4    A.  That is correct.

5    Q.  That what you were hoping for and really investigating

6    is who are the source of these weapons and where are they

7    going?

8    A.  That is correct.

9    Q.  Okay.  All right.  So at some point then the

10   conversation ended, correct?

11   A.  Yes.

12   Q.  And then tell us how it ended and what happened next.

13   A.  After getting the initial information I stepped away

14   from the defendant to kind of process the information that I

15   was receiving.  I'm sure I spoke to some other officers

16   letting them know, hey, here's what he's telling me, as I

17   collected the information in Spanish.

18          And the idea was to determine if this is something

19   we were going to want to follow up with.  Were we going to

20   want to work and continue talking to person to, again, go up

21   the ladder and get a better case.

22   Q.  Okay.  What happened then?

23   A.  After talking to him I sort of -- I'm sorry, after I

24   talked to some officers, and I was trying to wrap my head

25   around this, I started walking back toward the defendant.

1            And to lay it out, the defendant is standing next

2    to a garage door is and is able to oversee the entire

3    garage.  As I'm walking toward the defendant, his eyes --

4    his facial expressions changed, almost like a surprise or a

5    nervousness.  I then heard officers behind me loudly say,

6    Camera.  When I hear the word camera in my line of work that

7    means that something has been found that needs to be

8    documented and pictured.  That is what I believed at that

9    time.

10           In connection with that, knowing that he had just

11   been telling me about something like firearms, and then he

12   started walking toward me in handcuffs saying, I'm just

13   going to show you.  And I assumed, kind of putting it

14   together at that moment, these officers just found

15   something, maybe the firearms that he had originally been

16   talking about that he had been saying were somewhere else.

17   And at this point time had run out and he was trying to, I

18   suppose, save a chance for him to work or help us.

19           So the gig was up, so to speak, at that point.

20   That's what I inferred at that moment.

21   Q.  Okay.  And you say then that he started walking towards

22   where the officers were who had shouted camera?

23   A.  Yeah.  I was roughly between the officers that said

24   camera and -- but closer to the defendant.  So he started

25   walking toward me in the direction of the cabinet area where

1    the firearms were found.

2    Q.  And this was at a time when all your interaction with

3    the defendant had ended and now it's starting up again, is

4    that right?

5    A.  That's correct.

6    Q.  How much time passed from the time the initial contact

7    with the defendant concluded and the events you're talking

8    about now?

9    A.  I'm going to guess between two and four minutes.

10   Q.  Okay.

11   A.  It was short.

12   Q.  And as -- then you say the defendant started working

13   towards these officers and what did he say?

14   A.  I'm going to show you.  I'll just show you.  Something

15   to that extent.

16   Q.  Okay.  Was that in response to any questioning on your

17   part?

18   A.  No.

19   Q.  What happened next?

20   A.  If I recall, I stopped him, told him to back up and then

21   followed up with the officers asking, What did you find?

22   And at which point I was told firearms.

23          I then, kind of what I said earlier, I believed

24   that -- I was kind of processing it at the time, that the

25   defendant clearly was truthful about having knowledge of

 1    firearms, was trying to put those firearms in a different

 2    location, whether to lead us away from this garage or other

 3    reasons, and we had just found them.

 4    Q.  Okay.  Now these officers who you say had found the

 5    firearms, where did they find the firearms?

 6    A.  It was my understanding they were in or by cabinets in

 7    some bags.

 8    Q.  Okay.

 9    A.  Like large bags.  Duffle bags.

10    Q.  Okay.  I'm going to jump ahead.

11    A.  Yeah.

12    Q.  The police got a warrant, came back, seized these

13    firearms, right?

14    A.  Yes.

15    Q.  Were you there?

16    A.  Yes.

17    Q.  Okay.  So you know where they were found, right?

18    A.  I didn't recover them myself, but --

19    Q.  You saw them -- you saw them recover them?

20    A.  Yes.

21    Q.  Okay.  So let's just jump ahead.  At the time you saw

22    them, the police recovering the firearms, where were they?

23    A.  They were in a file cabinet in the center -- roughly

24    center of the garage.

25    Q.  All right.  But you can't give us any rough dimensions

1       of that cabinet?

2       A.  This would be -- from three years I'll give you my best.

3       Q.  Okay.

4       A.  But -- yeah.  I'm sorry.  I would --

5       Q.  Well, would it help you to know that there were, I

6       believe, twenty-three firearms recovered from that -- I

7       think it was roughly on the order of twenty -- over twenty

8       firearms?

9       A.  I don't remember the number.  I thought -- but I know it

10      was over ten, fourteen maybe.

11      Q.  Fourteen.  I guess I'm wrong.  So fourteen firearms is

12      rather bulky and --

13      A.  Yes.

14      Q.  So the cabinet was at least able to handle fourteen

15      firearms, right?

16      A.  Yes.

17      Q.  It was at least that big?

18      A.  Yes.

19      Q.  All right.  So now you said that some of these firearms

20      were in bags?

21      A.  Yes.

22      Q.  Were the firearms clearly visible, though, when you

23      looked into that file cabinet?

24      A.  I never looked into the file cabinet.

25                    THE INTERPRETER:  Sorry.  The interpreter did not

1    hear that last response.

2    BY MR. HOLLENHORST:

3    Q.  Did you look at the weapons after they came out of

4    filing cabinet?

5    A.  Yes.

6    Q.  What did they look at?

7    A.  From my --

8            THE COURT:  Actually I think for the record we

9    should maybe repeat -- go back one.

10           MR. HOLLENHORST:  Oh, I'm sorry.  I'm sorry.

11           THE COURT:  I think in fairness we should have

12   that answer as part of the record.

13           MR. HOLLENHORST:  Okay.

14   BY MR. HOLLENHORST:

15   Q.  All right.  So I understand that you did not actually

16   look at the firearms when they were in the cabinet, is that

17   right?

18   A.  I don't recall looking at those, no.

19   Q.  But you saw the firearms after they had come out of the

20   cabinet?

21   A.  Yes.

22   Q.  And what did they look like?

23   A.  I don't recall all specifications but I believe they

24   were what we call long guns.  So rifle-type shotgun, longer

25   guns.

1    Q.  Okay.  So when they came out of the file cabinet you

2    could clearly identify them as firearms?

3    A.  So when they were taken out of the file cabinet, I saw

4    them later.  I did not see them in the cabinet.

5    Q.  When did you see them later?

6    A.  When they were being inventoried.  I believe they were

7    being done in the lobby area of that location.

8    Q.  Okay.  I guess what I'm getting at here is that, you

9    know, you can put a handgun -- a little handgun in a bag and

10   you can't -- wouldn't be able to see the handgun, right,

11   because it's in a bag?

12   A.  Sure.

13   Q.  Were these guns such that you could identify these

14   guns -- in fact, identify at least some of them through

15   other means, like the long rifles?

16   A.  So if they're in bags --

17            MR. O'BRIEN:  Well, I'm going to object, Your

18   Honor.  I think the witness has said he didn't see the guns

19   when they were in the cabinet.

20            MR. HOLLENHORST:  Well --

21            THE COURT:  You can clarify the time.

22            MR. HOLLENHORST:  Right.

23   BY MR. HOLLENHORST:

24   Q.  When you saw these guns in the lobby, describe them.

25   A.  So this was, again, three years ago.  I remember they

1    were put on a table in a bag, opened up and there was just

2    various long guns in there.

3              THE COURT:  When you say bag, what you do mean?

4              THE WITNESS:  Sorry.  So like a duffle --

5              THE COURT:  A bag can be the size of a purse --

6              THE WITNESS:  I'm sorry.

7              THE COURT:  -- it could can be a long bag that you

8    hold a --

9              THE WITNESS:  I understand.

10             So what I'm talking about a bag is more of a

11   duffle bag.  Something big enough, long enough to

12   accommodate a long gun.

13             So if I was to guess they would probably be

14   anywhere from the -- you know, around 20 inches long kind of

15   a duffel bag.  At least maybe 36 inches long and just had

16   guns in it.

17             But just --

18   BY MR. HOLLENHORST:

19   Q.  Were all the guns in that bag?

20   A.  I don't recall how many bags there were.

21   Q.  All right.  You're aware, though, that the officers?

22             THE COURT:  Sir, Mr. Hollenhorst --

23             Do you remember what kind of guns roughly they

24   were?

25             THE WITNESS:  No, Your Honor.  My role as a

1    supervisor is kind sort of overseeing the situation.

2            MR. HOLLENHORST:  Your Honor, I was under a

3    misconception -- this is my mistake, this is the

4    government's mistake.  I was under the distinct impression

5    that the witness had seen the guns, could identify the guns

6    in the cabinet.  I think I know what Mr. O'Brien's response

7    is --

8            THE COURT:  I'm sorry, you know what?

9            MR. HOLLENHORST:  I think I know what Mr.

10   O'Brien's response will be to this request, but I would ask

11   the Court not to continue this hearing, because we can get

12   everything done here, but to leave the hearing open for me

13   at a later time to call the officer who actually seized the

14   weapons because it's going to -- it's -- we're not trying to

15   pull any fast ones but my understanding of the facts is that

16   the officers opened up this cabinet, they saw firearms and

17   then they went to get a warrant, and it is reflected in the

18   second warrant that they found firearms, they actually saw

19   firearms.

20           But I think to aid the Court in understanding the

21   full facts it would be helpful for the government to

22   actually call a witness who initially found the firearms.

23           I thought this witness knew that because he was

24   supervising and he was at the scene.  My bad.

25           So that's our request that we -- after we conclude

1    this hearing.  And I don't think that testimony would last

2    more than about five minutes and we can schedule the hearing

3    at some subsequent time.

4            THE COURT:  Do you want to respond now or we

5    finish examination of the Sergeant and then we can

6    request -- I don't care, I mean.

7            MR. O'BRIEN:  I would prefer that we finish the

8    examination and then deal with this request.

9            MR. HOLLENHORST:  That's fine, Your Honor.

10           THE COURT:  Okay.  And I'll ask, if I may, again,

11   if you have any recollection of -- you don't have to qualify

12   specifically what model.  I mean, were they like shotguns,

13   were they AR-15s, are they, like, 9 millimeters?  Any idea

14   like that or --

15           MR. HOLLENHORST:  Your Honor, they are inventoried

16   on Government's Exhibit 2.  There's a list of them.  They're

17   inventoried.

18           THE COURT:  Well, maybe for the record, refresh.

19           MR. HOLLENHORST:  Yeah.

20           So, Your Honor, we would just rely upon Government

21   Exhibit 2 which is in evidence, that it does list every one

22   of the firearms.

23           And if the witness doesn't remember those

24   firearms, I think that's his testimony.

25           THE COURT:  Okay.

1    BY MR. HOLLENHORST:

2    Q.  But so -- but let's complete your testimony.

3            Once the warrant -- the second warrant came in

4    then you saw officers take guns or something out of this

5    cabinet and then bring them into the lobby area, is that

6    right?

7    A.  That's correct.

8    Q.  And then you saw, as officers opened the bag at least,

9    and there were a number of firearms in there, right?

10   A.  Correct.

11   Q.  Long rifles, handguns and the like?

12   A.  As I recall, yes.

13   Q.  Okay.  Then what did you do?

14   A.  Nothing.  I didn't touch the guns, if that's what you're

15   asking or do anything with the guns.

16   Q.  Okay.

17           MR. HOLLENHORST:  I think, Your Honor, that

18   concludes the testimony concerning that date but now we're

19   going to get into the statement the next day.

20           THE COURT:  Yeah, proceed.

21           MR. HOLLENHORST:  Okay.

22   BY MR. HOLLENHORST:

23   Q.  After the guns were seized and everyone left you were

24   then called to duty the next day, right?

25   A.  Yes.

1    Q.  And what did you do on that date in connection with this

2    case?

3    A.  I was asked by Ramsey County Deputy John Ferrian to

4    assist him in conducting an interview of the defendant in

5    Spanish at the Ramsey County Jail.

6    Q.  Okay.  And describe the setting?

7    A.  So inside the jail cold cell, about maybe 12x12, a

8    table, approximately four chairs, myself and Deputy

9    Farrington (sic) -- Ferrian in the room with the defendant.

10   Q.  And what time of day was this?

11   A.  Midday.  I'm guessing around 12:00, 1:00 somewhere in

12   there.

13   Q.  Okay.  And at this point Mr. Perez was booked and in

14   custody of the state, is that right?

15   A.  Yes.

16   Q.  And when you conducted the interview describe your

17   clothing and your colleague's clothing?

18   A.  Plain clothes.  And what I mean by that is we were not

19   wearing anything that was police identifiable.  So regular

20   clothing you would see anybody on the street wearing.  And

21   in our case I would guess my normal attire would be a

22   sweatshirt and some jeans.  Same thing with Deputy Ferrian.

23   Q.  Were you carrying weapons?

24   A.  No.

25   Q.  Okay.  How would you describe the defendant's general

1    demeanor on that date?

2    A.  He wasn't -- good question.  He was fine.  He was

3    normal, relaxed.

4    Q.  Did he appear to be intoxicated?

5    A.  No.  Not to me.

6    Q.  Okay.  Did he appear to be lucid?

7    A.  No.

8    Q.  Lucid meaning clear of mind.

9    A.  Oh, I'm sorry.  Yeah.  He was fine, he had been in jail

10   for about a day, so.

11   Q.  Okay.  And so you were -- and then ultimately you asked

12   him questions, he answered and did his answers appear to be

13   responsive to your questions?

14   A.  Yes.

15   Q.  Did you make any threats to him during the period of

16   this interview?

17   A.  No.

18   Q.  Did he have any concerns that, for example, I have to go

19   to the bathroom or I feel uncomfortable?  Did he voice any

20   such concerns?

21   A.  No.

22   Q.  Were you generally friendly and of good behavior during

23   this interview?

24   A.  Yes.

25   Q.  And your colleague as well?

1    A.  Yes.

2    Q.  Okay.  So prior -- so you had a recording machine, did

3    you not?

4    A.  Yes.

5    Q.  Did you activate your recording machine at some point?

6    A.  Yes.

7    Q.  When?

8    A.  When we sat down and the defendant -- we were waiting

9    for the defendant, if I remember, and when we were all ready

10   to start I turned on the recorder.

11   Q.  Okay.  At some point after you turned on the recorder

12   did you read the defendant his *Miranda* rights?

13   A.  I did.

14   Q.  Prior to turning on the recorder did you question the

15   defendant in any way?

16   A.  No.

17   Q.  So let's get to the *Miranda* rights warning.  It's

18   clearly visible on the auto tape, is that right?  I mean,

19   audible.  It's audible on the tape?

20   A.  Yes.

21   Q.  Okay.  And but you also when doing so you used a

22   standard police phone number, did you not?

23   A.  That is correct.

24   Q.  Is that marked as Government Exhibit 3?

25   A.  Yes.

1    Q.  And so you were on the tape, you read through these

2    rights and then --

3             MR. O'BRIEN:  Your Honor, excuse me.  Has that

4    been introduced?

5             MR. HOLLENHORST:  We will.

6             MR. O'BRIEN:  Okay.

7             MR. HOLLENHORST:  Yeah.  So I'll offer Government

8    Exhibit 3 at this time?

9             MR. O'BRIEN:  No objection.

10            THE COURT:  Court receives Government Exhibit 3.

11   BY MR. HOLLENHORST:

12   Q.  So I'm going to hand this up to you in a second if the

13   Court permits, but before I do that there's some writing on

14   the top, right?

15   A.  Correct.

16   Q.  And that's the general information, the date, the time,

17   the name of the defendant and some other standard booking

18   information, is that right?

19   A.  Yes.

20   Q.  And then there are four separate questions in Spanish,

21   is that right?

22   A.  Yes.

23   Q.  And then next to each one there are initials that appear

24   to be S.G., is that right?

25   A.  Yes.

1      Q.  Who made those initials?

2      A.  The defendant.

3      Q.  Okay.  And those are presumably the initials for Santos

4      Gomez, right?

5      A.  Correct.

6      Q.  And then is it true that the defendant signed his name

7      at the bottom of the form?

8      A.  Yes.

9      Q.  And then you applied your name and put the date on

10     there, correct?

11     A.  Yes.

12     Q.  Okay.

13          MR. HOLLENHORST:  And I would just ask, Your

14     Honor, does the -- is the defense contesting the *Miranda*

15     rights warning or should we go through what was actually

16     read in Spanish and then the witness I will have him

17     translate what that means?

18          MR. O'BRIEN:  Your Honor, I'll stipulate that that

19     Spanish form correctly translates the *Miranda* warning.

20          MR. HOLLENHORST:  Okay.  Thank you.

21          THE COURT:  Thank you, counsel, for that courtesy.

22     BY MR. HOLLENHORST:

23     Q.  So after reading these *Miranda* rights in Spanish, which

24     are the standard rights that one would hear in English,

25     correct?

```
 1    A.  Yes.

 2    Q.  Then the defendant by his initials and through his

 3    signature I take it responded that he was willing to answer

 4    questions?

 5    A.  Yes.

 6    Q.  And then you did question the defendant and he gave a

 7    fairly lengthy statement of his involvement with these

 8    firearms, is that right?

 9    A.  Yes.

10    Q.  And how long did that interview last?

11    A.  About 30 minutes.

12    Q.  Okay.  So by the end of the interview the defendant had

13    provided you with quite a few details as to how the weapons

14    were acquired by him, what he did with them and what his

15    intentions were thereafter with respect to these weapons?

16    A.  Yes.

17    Q.  Okay.  Did his answers mirror or differ somewhat from

18    his initial statements the day before?

19    A.  They were similar, but now in this setting there was --

20    do you want me to give an example?

21    Q.  Yes.

22    A.  Okay.  So when we were speaking at the garage the day

23    before he had mentioned that the guns were going to go to

24    Mexico.  But in this interview, although he came very close

25    to it, he was just short of saying he knew they were going
```

1    to Mexico that maybe they were going to another state, but

2    not that he knew that he was going to hide them to be

3    transported.

4              So he alluded to it that he was going to hide

5    things.  But little details, little details that --

6    Q.  Okay.

7    A.  Same story line, just trying to keep a little bit away

8    from -- I don't know how to describe it.

9    Q.  So he provided more details?

10   A.  Yeah.  He provided more details.

11   Q.  But did his statement seem plausible to you at the time

12   of the interview?

13   A.  Yes.

14   Q.  Did you ever confront him and show an angry face to try

15   and get him to say something else?

16   A.  No.

17   Q.  Okay.  And everything that you said and he said is

18   recorded on this audio that we've provided the Court.

19             I'm going to now offer Government Exhibit 4.  This

20   is the statement, right?

21   A.  Correct.

22             MR. HOLLENHORST:  Your Honor, we would offer

23   Government Exhibit 4.

24             MR. O'BRIEN:  No objection.

25             MR. HOLLENHORST:  Okay.

```
1              THE COURT:  The Court receives Government
2    Exhibit 4.
3    BY MR. HOLLENHORST:
4    Q.  And you've listened to Government Exhibit 4, at least,
5    you know, prior to your testimony today?
6    A.  Yes.
7    Q.  And everything that you said to him and he said to you
8    is captured on that, right?
9    A.  Yes.
10   Q.  After you turned off the recorder what if any
11   conversation was there?
12   A.  Okay.  So there's two recordings.
13   Q.  Right.  Okay.  Yes.  Please explain that.  There's two
14   files.
15   A.  There's two files.  My partner that was assisting Deputy
16   John Ferrian does not speak Spanish.
17              I ran the interview and believing that I had asked
18   the proper questions about the firearms, how he got them, I
19   believe the interview was over.  So what I did is I ended
20   the interview, turned off my recorder and then explained to
21   the Case Agent John Ferrian what he had said, you know,
22   summarizing it.
23              Deputy Ferrian had followup questions that he
24   wanted me to ask.  So we turned the recorder back on in
25   order to ask those questions.
```

1    Q.  Okay.  Was there any questioning of the defendant during

2    that break?

3    A.  No.

4    Q.  And once the recorder was reactivated and another -- and

5    additional questions were asked then the recording was

6    turned off again, right?

7    A.  Yes.

8    Q.  Were there any questions after the recording -- recorder

9    was turned off?

10   A.  No.  Just, see you later, goodbye, thank you or

11   whatever.

12   Q.  Okay.

13            MR. HOLLENHORST:  I think that's all the questions

14   I have, Your Honor.

15            THE COURT:  Okay.  Very well.  Mr. O'Brien.

16            MR. O'BRIEN:  Thank you.

17                       **CROSS-EXAMINATION**

18   BY MR. O'BRIEN:

19   Q.  I know it's been almost three years, it will be three

20   years next month since this incident and I understand that

21   you're an officer from St. Paul and this -- this repair

22   garage is located in Minneapolis.

23            I have one threshold question.  You thought that

24   the tracking devices may be located at the Olympic Auto Care

25   on 4050 North Washington because you were getting a signal

1    back to that area?

2    A.  Yeah.  So let's see if I can clarify this because I

3    don't want to misspeak.

4         The case agents who had applied these trackers --

5    these trackers would at a certain interval send back the

6    tracker's locations, they would even send back if you

7    removed the trackers.

8         So based on the information, I don't remember if

9    they got a removal alert or what it was, but their last

10   location had been this area or this location and that is why

11   they were seeking to recover them.

12   Q.  So the information you're receiving about the tracking

13   device, would that give you precise information as to where

14   within a building the device would be?

15   A.  Once the -- from my experience, not -- not the technical

16   person that operate -- or, I'm sorry, that creates these

17   things.  From my experience, once those trackers get under

18   or inside the building or -- depending on how the building

19   is made, the accuracy will start getting -- so a lot of

20   times you'll get, you know, it will give you like a radius

21   and once they -- so you could see the radius or the device

22   moving toward this location and then you could see it all of

23   a sudden become larger.

24        So from experience you would know that clearly

25   this device has entered inside of a building because the

1    radius has changed.  So I'm giving you an explanation of

2    generally how it works.

3              In this case if I remember correctly, there was

4    one tracker -- the first tracker had gone missing in this

5    location and the investigators deduced that this is the

6    location when the second tracker also went back to this

7    location and disappeared.  So that's how they were able to

8    decide that this would be the location.

9              So once you're inside the building and you're

10   putting inside the building, there's no way to really know

11   exactly where inside that building the tracker would be,

12   like exact location.

13   Q.  So when you were -- officers were carrying out the

14   search of 4056 Washington, the tracking device wasn't giving

15   you any help in locating it?

16   A.  Within the building?

17   Q.  Yes.

18   A.  No.

19   Q.  Okay.  So 4056 Washington, that's located on the

20   Mississippi River, correct?

21   A.  I don't know if it's on the Mississippi River, I'm just

22   using the address.

23   Q.  Well, it's an industrial area, isn't it?

24   A.  Yes.

25   Q.  How many times have you been to that building?

1    A.  I'm guessing, once, maybe twice.  I don't remember if we

2    did anything in advance of this or not.

3    Q.  Okay.  And, again, it's been almost three years but you

4    do remember what the building looks like, right?

5    A.  Yes.

6    Q.  And you know that it's located next to a junkyard?

7    A.  That sounds about right.

8    Q.  And, in fact, surrounding this building are a lot of

9    junked and abandoned -- or were back in March of 2019,

10   abandoned and junked cars, right?

11   A.  Yeah.  I don't want to get too far ahead of myself.  I'm

12   not disputing you, I just don't remember that part.

13   Q.  The address is painted on the wall, isn't it?

14   A.  I don't remember.

15   Q.  Do you remember any signs, any signage?

16   A.  Nope.  I don't remember.

17   Q.  Do you remember an open or closed sign?

18   A.  No.

19   Q.  Does that mean you don't remember if there was --

20   A.  I'm sorry, I don't remember.

21   Q.  Do you remember any advertisements?

22   A.  I do not recall.

23   Q.  Are there any windows to the outside?

24   A.  No.

25   Q.  There are no windows.

1    A.  Not that I recall, no.  If they were they were -- they

2    would have -- from what I recall they would have been

3    covered up because I don't remember being inside the garage

4    being able to see outside.

5    Q.  So when you appeared at 4056 North Washington how long

6    was it before you or any officers entered the building?

7    A.  I don't -- I don't remember.

8    Q.  An hour?

9    A.  I wouldn't think so.  I don't remember.

10   Q.  Did you see any customers going in or going out?

11   A.  If I recall, I wasn't in -- I wasn't in the front of the

12   building, like watching the building.

13   Q.  So you didn't see anyone -- any customers going in or

14   going out?

15   A.  Not that I recall.

16   Q.  There's a door -- a door to the office.  And is that the

17   door the officers entered?

18   A.  Yeah.  It's the only door I remember.

19   Q.  Well, there's -- there are there are doors that would

20   allow a vehicle to come in and out, right?

21   A.  Yes.  Yes.

22   Q.  But they were closed?

23   A.  Correct.

24   Q.  And did you see those doors?

25   A.  The garage doors?

1    Q.  Yeah.

2    A.  Yes.

3    Q.  Were there -- were there vehicles blocking those doors?

4    A.  So I want to say -- you know, I don't recall.

5    Q.  Was that -- the smaller door that you went into, not the

6    garage bay doors, the smaller door that you and the officers

7    went into, was that open or closed?

8    A.  I know it was unlocked.  I don't know if -- do you

9    remember like -- I don't think the door was opened.

10   Q.  It wouldn't have been opened in March, right?

11   A.  No.

12   Q.  So did officers announce their presence before opening

13   the door?

14   A.  I assume they did, yes.  That's their standard

15   procedure.

16   Q.  But you don't know whether they did or not?

17   A.  Correct.

18   Q.  Were you first in line, second in line or --

19   A.  I was --

20   Q.  Where were you in the order?

21   A.  I was way in the back.

22   Q.  Way in the back?

23   A.  Yeah.

24   Q.  Well, when you went -- when you went in that small door

25   you're essentially in this little lobby area, right?

 1    A.  Yes.  As I recall, yes.

 2    Q.  There's some chairs for customers?

 3    A.  Yes.

 4    Q.  There's like a -- oh, there's a window like a -- like in

 5    a bank where a bank teller would be.  There's a window there

 6    where presumably someone who was working for the auto repair

 7    place would be?

 8    A.  As you mentioned it, yes.  I do think I recall that,

 9    yes.

10    Q.  Were there any customers in that lobby area?

11    A.  I don't know.  I know -- I think we had at least a team

12    of three people, I just don't know if they were part of the

13    work crew or if they were from the lobby.  I don't remember.

14    Q.  Okay.  I didn't speak well.  Did you arrest anybody in

15    the lobby area?

16    A.  We -- people were detained.  I don't know if they were

17    in the lobby area.

18    Q.  You don't know where anyone was arrested?

19    A.  I'd remember -- if I remember correctly, the defendant

20    was and one other person were detained at the front door and

21    then one other person was detained inside the garage.

22    Q.  The defendant was detained at the front door did you

23    say?

24    A.  If I recall correctly.

25    Q.  You mean the door to the outside?

1    A.  Yes.  That's the best I recall, so.

2    Q.  So you're saying that the defendant was in the lobby

3    area when officers arrived?

4    A.  No.  I -- just that he was detained right by the front

5    door.  So I -- yeah, he must have -- I don't know if he was

6    inside or stepping out.  I don't know.  I didn't make any

7    arrests.

8    Q.  Well, wasn't the defendant detained in the work area?

9    A.  I believe he was detained.  I'm sorry, let me back up.

10        Are you asking if he was in the work area at any

11   point?  Because I spoke to him in the work area.

12   Q.  Well, let's just clarify.  There's a lobby area and I

13   think you said it was maybe 14x14?

14   A.  Somewhere like that.

15   Q.  And then there's a door that leads into a large

16   mechanic's area?

17   A.  Yes.

18   Q.  There was a lot of lifts and wells and equipment and

19   parts and all that, right?

20   A.  Yes.

21   Q.  So which -- when you -- when you arrested the defendant,

22   where was he?

23   A.  So as I said -- what I recall is he was detained at the

24   front entrance area of the business.  I didn't arrest him.

25   I think just for clarification, this is a Ramsey County

1   search warrant that Ramsey County supervisors who were their

2   Task Force.  So a lot of these things that I'm saying I

3   don't recall is because it was --

4   Q.  So -- but you had this talk with the defendant in the

5   work area?

6   A.  Yes.

7   Q.  And you're saying he may have been detained in the lobby

8   area?

9           MR. HOLLENHORST:  Objection, Your Honor.  Asked

10   and answered a thousand times.

11           THE COURT:  I'll overrule because it's very

12   confusing to me so far.

13   BY MR. O'BRIEN:

14   Q.  I'd like to know when -- if he was arrested in the lobby

15   area when was he brought to the work area?

16   A.  I don't know.

17   Q.  Did you see him being brought from the lobby area to the

18   work area?

19   A.  I don't recall seeing him be brought to there.

20           THE INTERPRETER:  The interpreter did not hear

21   that last response.  I apologize.

22           THE WITNESS:  I don't recall.  I don't recall if

23   he was in the lobby area wanting to speak with me and then

24   he stepped into the garage area to speak quietly or

25   privately or if he was already there.

1                    THE COURT:  Mr. O'Brien, if I may.

2                    When you first encountered Mr. Gomez was he

3        already in handcuffs?

4                    THE WITNESS:  I believe in watching the video, my

5        video, I believe he was at the front door on the floor

6        before he was handcuffed, so he wasn't handcuffed.  I would

7        have gone past him.  So if you're going to the garage --

8                    THE COURT:  So when you first saw him he was on

9        the floor near the entrance area as opposed to the back

10       area, is that correct?

11                   THE WITNESS:  Correct.

12                   THE COURT:  Okay.

13                   THE WITNESS:  So we would have all approached.

14                   I was really far behind as a supervisor, too, you

15       would lead -- lighten people up front and then as we went

16       inside we dealt with everything, whatever was inside.

17                   But if I recall correctly that Mr. Gomez was not

18       -- I didn't detain him, but was not detained inside the big,

19       open garage area.

20                   THE COURT:  Clarification of the garage area

21       versus this front area.

22                   THE WITNESS:  Yeah.

23                   THE COURT:  I think we've been trying to --

24                   THE WITNESS:  Sorry.

25                   THE COURT:  Did you say there was a door, like a

1    closed door there.  Did you recall or --

2            THE WITNESS:  So if you think about a pretty

3    typical repair shop you would go to the front door.  This is

4    a -- if I remember there was a big metal door, you open it

5    up.  You walk into the lobby area, there was a counter there

6    and I believe Mr. O'Brien described the glass partition.  So

7    that would have been like a clerical area.  And then there's

8    the lobby area with chairs beyond that.  There would be a

9    door to go into the actual main working area of the garage.

10           THE COURT:  Okay.  Thank you.

11   BY MR. O'BRIEN:

12   Q.  So the defendant was working at Olympic when you

13   entered, correct?

14   A.  So I didn't see him like physically working but I

15   assumed he was.

16   Q.  When you and officers entered the shop did you and other

17   officers point firearms at the people that were inside?

18   A.  Yes.

19   Q.  And you did that for what reason?

20   A.  As we're entering we're clearing an area.  You don't

21   know what is a threat, not a threat.  And so we, kind of

22   like any search and search warrant at that time and point

23   your guns at, if you see someone, you don't know what's in

24   their hands --

25   Q.  And --

1    A.  -- just as a tantamount to gain compliance.

2    Q.  And was that in the lobby area or in the work area?

3    A.  Probably both.

4    Q.  So you didn't put the defendant in handcuffs?

5    A.  I don't recall putting him in handcuffs.

6    Q.  But you know at some point he was in handcuffs?

7    A.  Yes.

8    Q.  And he was on the floor, right?

9    A.  Yes.

10           MR. HOLLENHORST:  Your Honor, the government

11   concedes the defendant was in custody at the time of

12   these -- this conversation that the witness had with him.

13           THE COURT:  Thank you.

14   BY MR. O'BRIEN:

15   Q.  Now, you spoke with Mr. Gomez about what you considered

16   his exposure to drug charges, right?

17   A.  No.

18   Q.  You didn't tell him?

19   A.  I'm sorry, in the interview?  In the interview you're

20   talking about?  In the recorded interview or are you talking

21   differently --

22           THE COURT:  Could you clarify what timeframe.

23   BY MR. O'BRIEN:

24   Q.  I don't know.  Well, from the time that the defendant

25   was on the ground in handcuffs going forward did you tell

1    him -- did you ever talk with him about his exposure to drug

2    charges?

3    A.  That he was being arrested for drug charges?  I believe

4    that was conveyed to him in Spanish finally at some point.

5    Q.  Did you tell him that he was going to jail for drug

6    charges?

7    A.  I believe that was basically inferred when I told him he

8    was under arrest for drug charges.  I don't know if I used

9    the exact term jail but.

10   Q.  Okay.  Because you've made some reports on what happened

11   on the 14th of March, right?

12   A.  Yes.

13   Q.  And did you review those reports before today?

14   A.  Yes.

15   Q.  You made a report on the 28th of March and you stated,

16   "I had previously talked to defendant and told him he was

17   going to jail for drugs."  I had previously.  That's what

18   your report says, right?

19   A.  Can I look at it real quick just to make sure I have the

20   right words?

21   Q.  Sure.

22   A.  Yeah.  So I see the sentence you have there and I -- I

23   guess my -- what I'm saying is the intent is to either --

24   that is the intent.  To make sure he understands it's a drug

25   charge, whether he's being arrested for narcotics and then

```
 1    infer he's going jail or, hey, you're going to jail for
 2    narcotics.
 3             Either way I was -- I think we're splitting hairs
 4    in my opinion but, yes, I'm agreeing with you.  That's the
 5    intent of the conversation.
 6    Q.  I just want to know when this conversation took place.
 7    A.  Oh.  That was before I spoke to him.
 8    Q.  I'm sorry what?
 9    A.  Before I spoke to him in the garage.  Is that --
10    Q.  When did you first speak to the defendant?
11    A.  I'm assuming -- again, I'm remembering here, from
12    assuming I told him he was arrested or going to jail for
13    narcotics prior to our conversation where I was told, hey,
14    he wants to talk to you.
15    Q.  Well, what --
16    A.  So basically.
17    Q.  Well, when you told him -- go ahead.  I'm sorry.
18    A.  So when he was told he was arrested/detained/going to
19    jail, after that is when we had the conversation.
20    Q.  Okay.  So this conversation where you told him that he
21    was going to jail for drugs, that happened in the work area
22    or in the lobby area?
23    A.  I don't recall.
24    Q.  Once officers gained access to the work area officers
25    started looking for the tracking device, right?
```

1    A.  Correct.

2    Q.  And about how long before officers entered the work area

3    did they find firearms in a cabinet?

4    A.  I'm going to guess anywhere from 10, 20 minutes.

5    Somewhere in that neighborhood.  I just don't remember.

6    Q.  Have you seen the filing cabinet?

7    A.  When I was there at the garage, yes.  I just don't

8    recall it.  There was a lot of stuff there.

9    Q.  Well, did you see the filing cabinet before the guns

10   were found or after?

11   A.  My attention would have been drawn to it after.

12   Q.  After.

13   A.  I mean, clearly I walked in, helped search, clear the

14   area.  It would have been one of many things I wouldn't

15   have, you know, paid attention to and then afterwards later

16   they would have alerted me to the guns and that's when I

17   would have paid attention to it.

18   Q.  So you don't know whether the filing cabinet was open or

19   closed?

20   A.  No.

21   Q.  You don't know if it had a lock on it?

22   A.  No.

23   Q.  And do you know how officers gained entrance to the

24   filing cabinet?

25   A.  No.

1    Q.  There's been some talk of the guns being in a bag and I

2    think you said you never saw the guns while they were in the

3    bag, correct?

4    A.  If I recall correctly they were brought into the lobby

5    and that's where they were kind of opened up -- the bag

6    would be opened up and guns would have been looked at for

7    inventory purposes.

8         Just wasn't -- I was just standing around.  I

9    wasn't the one inventorying them and I had a lot going on so

10   I didn't specifically just concentrate on these guns.

11   Q.  Did you see the guns while they were in the bag with the

12   bag closed?

13   A.  I don't recall.  I want to say no but I don't recall.

14   Q.  Okay.  But you did see the guns when they were out of

15   the bag.

16   A.  Out of the -- well, they were -- if I recall correctly,

17   they would have been -- the bag would have been opened up in

18   the lobby area so I would have -- when they were, you know,

19   bag opened up, guns inside, then we would have gone through

20   them in more detail.

21   Q.  So you had an opportunity to -- opportunity to see the

22   bag, correct?

23   A.  Yes.  I must have.  Yes.  Yep.

24   Q.  And was that bag a see-through bag?

25   A.  No.  I remember that.

1    Q.  So if the bag was closed, is it fair to say the firearms

2    could not have been seen?

3    A.  I wasn't there.  I wasn't there.  I mean, I guess I'm

4    not sure what you're -- maybe could you reask that again?  I

5    just want to make sure I get this right.

6    Q.  Well, was it a see-through bag?

7    A.  No.

8    Q.  So if the bag's closed, someone looking through the bag

9    would not see the firearms, correct?

10   A.  I don't know if the bag was open or closed, I don't

11   know.  I was not the one who found the bag in the cabinet.

12   I did not go to the cabinet to, like, investigate.  I was

13   just doing one small part in this whole thing.

14   Q.  By the way, were any of the officers wearing body cams

15   during all of this?

16   A.  Not during the search.

17   Q.  Why?

18   A.  Because once the -- once the area is considered safe or

19   that we have control of it, the police have control of it

20   and we are not individually -- I'm sorry, any members of our

21   St. Paul Police Department are not holding or detaining

22   anybody inside we can then shut off our video cameras -- or

23   our body-worn cameras.

24   Q.  So up until the point that people are detained,

25   including the defendant, body cams would have been on and we

1    would have seen that?

2    A.  Yeah.  So everyone would have been detained.  A search

3    would have been -- a search would have been -- a search as

4    in like for dangers, a protective sweep would have been

5    done, at which point an evaluation would have taken place,

6    are we safe, do we have control of it?  Yes.  At which point

7    we announce, all right, body cams can go off and we can all

8    shut off our body cameras at roughly the same time.

9    Q.  So a decision to turn off the body cams was made?

10   A.  Yes.

11   Q.  Is that decision made by each individual officer or is

12   the supervising officer giving an order to do that?

13   A.  So our officers know the policy, so if they're following

14   policy they can shut it off.  But in these situations we

15   typically leave it to a supervisor to make a decision to

16   shut off video cameras.

17   Q.  Okay.  So I don't want to belabor this too much but --

18   A.  Yeah.

19   Q.  -- when officers entered with guns drawn, their body

20   cameras would have been on?

21   A.  Yes.

22   Q.  And if Mr. Gomez was arrested in the lobby area that

23   would be seen on the body cam?

24   A.  Correct.  Could I -- one point of clarification?

25              St. Paul Police are the only group that I know of

1    in this group that would have body cameras.  Ramsey County

2    side did not.  And there's some other agencies, like

3    Maplewood, Mounds View and I don't recall if they have body

4    cameras or not.

5    Q.  Okay.  But somebody had a body cam?

6    A.  Yes.  Including myself.

7    Q.  Okay.

8    A.  And that's why -- yep.

9    Q.  Okay.  In any event, you never administered a *Miranda*

10   warning to the defendant while at the body shop, right?

11   A.  Yes.

12   Q.  Or the car repair shop?

13   A.  That is correct.

14   Q.  Now, you said that you didn't feel it was necessary

15   because the defendant was volunteering statements in hope of

16   getting favorable treatment from law enforcement?

17   A.  Correct.

18   Q.  But it wasn't a one-sided conversation in that Mr. Gomez

19   wasn't just talking, he was responding to questions made by

20   you, right?

21   A.  I would argue with the word questions, maybe more

22   clarifications.  Because of my training and experience I

23   knew the situation, that he was providing information, yet

24   he was in handcuffs.  So I know I'm not going to ask him

25   about his criminal activity leading up to, like, with the

1    narcotics.  I -- that wasn't in my head.

2    Q.  But you wanted to know about these guns that he was

3    leading you on about, right?

4    A.  Yeah.  When he -- when he told me about guns and that he

5    could get them, we need to do some -- we need to -- I need

6    some clarifying questions or I need to clarify, like, what

7    are we talking about?  Are we talking about, again, here at

8    this location?  Are you talking somewhere else like another

9    city, state.  General.  I'm trying to get a very high level,

10   general understanding of what he's talking about.

11   Q.  Right.  So and to do that you're asking him questions?

12   A.  Yeah.  I guess I'm saying I'm clarifying what he's --

13   you know, what he's saying.

14   Q.  And that conversation was not recorded, right?

15   A.  No, it's not.

16   Q.  The following day -- oh, excuse me, before I leave the

17   14th, the defendant told you that he had a drug problem,

18   right?

19   A.  On the following day.  I think it's in my report, yes.

20   Q.  Well, didn't he tell you the day of the arrest that he

21   had a drug problem when you were talking to him?

22   A.  If I put it in my notes here.  Can I look at --

23   Q.  Sure.

24   A.  Okay.  So I'm not disputing -- where are you seeing

25   this?

1    Q.  Oh, I'm not citing a specific sentence.

2    A.  Oh.

3    Q.  I just want to know, did the defendant -- did defendant

4    tell you or not that he had a drug problem specifically a

5    methamphetamine problem?

6    A.  So if it's -- if it's not in my report, I mean, in what

7    I'm using to recall my memory, I don't recall him telling me

8    that.

9         I don't think it would have been part of what I

10   was trying to get at with clarifying his situation.

11   Q.  So when he -- when you and -- is it Sergeant Ferrian?

12   A.  Officer -- or deputy.  Deputy.

13   Q.  Deputy Ferrian appeared, was it at the Ramsey County --

14   A.  Ramsey County Jail.

15   Q.  Mr. Gomez didn't show any signs of drug withdrawal?

16   A.  I wouldn't be able to say he did.

17   Q.  Well, you've seen people going through drug withdrawal,

18   haven't you?

19   A.  You know what, to be fair with you, I think you'd have

20   define that a little better because I've seen people who use

21   narcotics maybe haven't used narcotics.  I don't know what

22   you mean by withdrawal.  Like a clinical setting, like --

23   Q.  Well, I think it's best, let me just stick with the

24   defendant.

25   A.  Yeah.

1    Q.  Did he seem in distress?

2    A.  No.

3    Q.  And I think you said he seemed normal, relaxed?

4    A.  For what I understood him to be, like his baseline, I

5    thought so.

6    Q.  Now, with respect to your Spanish, I mean, I respect

7    your life history but you're not a certified interpreter?

8    A.  No.

9    Q.  And you wouldn't dare do what this interpreter is doing

10   right now, would you?

11   A.  No.

12   Q.  Was all of the conversation between law enforcement and

13   the defendant on March 15th recorded?

14   A.  Likely the only things that were not recorded were the

15   hellos, how ya doing, goodbyes, that's it.  Yes.

16        So probably to your point is, yes, everything was

17   recorded.

18   Q.  And the Exhibit 4 is going to contain both the

19   questioning of the defendant by you before Deputy Ferrian

20   intervened and asked you to ask more questions and also the

21   questions you asked on behalf of Deputy Ferrian?

22   A.  Yes.  Deputy Ferrian was the case agent so everything

23   was -- it was his case and I was helping him with his

24   questioning.

25        MR. O'BRIEN:  Can I have just a second, Your

1    Honor?

2              THE COURT:  Yes.

3    BY MR. O'BRIEN:

4    Q.  You wouldn't -- well, I don't know.  Would you take a

5    statement from somebody who you thought was going through

6    drug withdrawal?

7    A.  So the only problem I'm having with that question, I

8    don't -- like, if I'm in a hospital and somebody's

9    convulsing, clearly not.  If someone just hasn't used,

10   whether it's alcohol or drugs or they were high at that

11   time, would you consider that withdrawal?  Is that what

12   you're asking?

13             So I'm a little confused at what -- because as I

14   understood from the statement I took from him, he used

15   methamphetamine but because he's been in jail for at least a

16   day, almost 24 hours, he wouldn't have access to -- well, I

17   shouldn't -- well, I don't know that he would have had

18   access to methamphetamine.

19   Q.  Okay.  When the defendant approached you or asked, I

20   think it was Sergeant Lackner -- when Lackner told you that

21   the defendant wanted to talk to you, that's when this talk

22   about the firearms that he allegedly knew about took place,

23   right?

24   A.  Correct.

25   Q.  But you had talked to the defendant prior to that,

1    right?

2    A.  He had been told, yeah, that he's under arrest or

3    whatever the statement was.  I don't remember the exact

4    words so it was just that he was going to go to jail for

5    narcotics.

6    Q.  You did talk to all of the people that were arrested at

7    the car garage, right?

8    A.  I am sure I interacted with them.  I don't -- I mean, I

9    don't know how far you want me to, like --

10   Q.  Well, did you ever find out what they were doing there?

11   A.  I don't believe I talked to them about that.

12   Q.  Did any officers talk to them?

13   A.  I don't recall.

14   Q.  So they were handcuffed?

15   A.  Yes.

16   Q.  And at some point they were unhandcuffed?

17   A.  Correct.

18   Q.  And you're saying there was no conversation?

19   A.  No.  I don't know.  I wouldn't have done it.  So I don't

20   know.  Any interactions would have been in passing, as I

21   recall.

22   Q.  Is it true that -- well, you know when the defendant was

23   arrested, correct?

24   A.  Yes.

25   Q.  And you had a talk with him before the talk about the

1    firearms, right?

2           You just mentioned that it was very short.  You

3    said, you're under arrest --

4    A.  Something to the extent that he was under arrest so that

5    he would understand what the situation was.

6    Q.  Did he tell you that 15 minutes before the police came

7    that he smoked methamphetamine?

8    A.  Not that I recall.

9    Q.  Okay.

10          MR. O'BRIEN:  No further questions.

11          THE COURT:  Okay.  Thank you, counsel.

12          Mr. Hollenhorst?

13          MR. HOLLENHORST:  Just a couple questions.

14                   **REDIRECT EXAMINATION**

15   BY MR. HOLLENHORST:

16   Q.  How much time passed from the time of that initial

17   contact you had with the defendant until the second contact

18   you had with the defendant?

19   A.  I would guess anywhere from three to five minutes.

20   Q.  Okay.  And the other point here is when the officers

21   found something after saying camera, isn't it true that

22   Officers Johnson and Leighton told you that they had just

23   found firearms?

24   A.  Yes.

25   Q.  Okay.  So clearly firearms had been located and observed

1   by police officers at the scene prior to the application of

2   the second warrant, correct?

3   A.  Correct.

4   Q.  Do you have any reason to doubt Officer Johnson and

5   Leighton's statements to you that they had found firearms?

6   A.  No.

7   Q.  And it was your understanding that they had found those

8   firearms in the cabinet we've been talking about?

9   A.  Correct.

10  Q.  And it's also your understanding that that cabinet would

11  have been something permissible under the first warrant, in

12  other words, to enter to search for tracking devices?

13  A.  Correct.

14  Q.  And the police never found the tracking devices, did

15  they?

16  A.  Correct.  They did not.

17  Q.  So at this point, I don't know how far along their

18  search was, but they clearly were still looking for tracking

19  devices when they found those firearms, correct?

20  A.  Correct.

21          MR. HOLLENHORST:  That's all I have, Your Honor.

22          THE COURT:  Mr. O'Brien?

23                    **RECROSS-EXAMINATION**

24  BY MR. O'BRIEN:

25  Q.  Would you agree that if the officers told you that they

1  found firearms that means that they had to have opened the

2  bag where the firearms were in?

3  A.  I don't know.

4  Q.  But you will agree that the bag is not transparent?

5  A.  Yes.

6          MR. O'BRIEN:  All right.  Nothing further.

7          THE COURT:  Anything else from government?

8          MR. HOLLENHORST:  No, Your Honor.

9          THE COURT:  Okay.  Okay.  Sergeant, thank you for

10  testifying.  You may step down.

11          MR. HOLLENHORST:  And, Your Honor, this witness is

12  permanently excused?

13          THE COURT:  Yes.

14          MR. HOLLENHORST:  Thank you.

15          (Off-the-record discussion.)

16          THE COURT:  Well, actually why don't you hang on

17  just in case.

18          MR. HOLLENHORST:  Okay.

19          MR. O'BRIEN:  Your Honor, the defendant would like

20  to testify.

21          THE COURT:  Okay.  Let's make sure Mr. Hollenhorst

22  has rested first.

23          MR. HOLLENHORST:  Well, Your Honor --

24          THE INTERPRETER:  Your Honor, the interpreter

25  would like just a short break.

1            THE COURT:  Okay.

2            THE INTERPRETER:  If I could.

3            THE COURT:  Let's see, of course.  Let's just

4    figure out how long we should take a break.

5            I've got a bench meeting at 2:00.  So

6    theoretically we could take a relatively brief break or we

7    can take a half an hour lunch break.  What do you guys

8    think?

9            MR. O'BRIEN:  I think the testimony's going to be

10   brief.

11           THE INTERPRETER:  I think just a brief break would

12   be better for the interpreter.

13           MR. HOLLENHORST:  Your Honor, and also it appears

14   that it is not going to be contested.  I don't want to speak

15   for Mr. O'Brien, that the police actually found firearms

16   that -- at the scene, so that would obviate the need for me

17   to call another witness.

18           MR. O'BRIEN:  Yes.  And defense will stipulate to

19   that, Your Honor.

20           MR. HOLLENHORST:  So, in other words, Your

21   Honor --

22           THE COURT:  Well, what about the nature of the bag

23   in the cabinet?

24           MR. HOLLENHORST:  Well, the -- I think the

25   agreement is that when the -- when the police shouted

1    "camera" they actually had entered the cabinet and found

2    firearms, whether they were in a bag or not.

3           Our theory in the case is that the police could

4    search anywhere, including closed containers, for those

5    tracking devices.

6           So it's really kind of irrelevant whether they

7    were in a bag or not in a bag, in the government's view.

8           THE COURT:  Well, I mean, it's your prerogative if

9    you don't want to develop that aspect of the testimony for

10   better or for worse.

11          MR. HOLLENHORST:  Well, my understanding, though,

12   is the defense is agreeing that the police did, in fact,

13   find firearms in that cabinet before they applied for a

14   search for -- to seize them.

15          MR. O'BRIEN:  That's right.

16          THE COURT:  Yeah.  I have --

17          MR. HOLLENHORST:  But at the time they opened the

18   cabinet they saw the firearms.

19          MR. O'BRIEN:  No.

20          THE COURT:  No.  Not that part.

21          MR. HOLLENHORST:  Yeah.  At the time they opened

22   the cabinet and whatever they did in the cabinet, they found

23   the firearms, they saw the firearms and then they got a

24   warrant.

25          THE COURT:  Well, the "saw" the firearm is the

1    tricky part.

2            Theoretically there could be an argument that,

3    well, inside the duffel bag, unless it was shaped by a

4    firearm or, you know, it was partly unzipped, there is an

5    argument, I would imagine, that defense will say, well,

6    it's, you know -- if you couldn't see it, you need some

7    extra layer.  I don't know what their argument would be

8    exactly but something to that effect.

9            If you're okay with saying that, yes, the guns

10   were found in the cabinet.  If defense is willing to

11   stipulate that and leave ambiguous whether it was visible,

12   you know, once the cabinet was open or not, the guns

13   themselves were visible, whether opaque or transparent bag,

14   whether you could see, even if it were opaque, if it was

15   tight enough you could see the outline of a magazine or a

16   barrel, what have you, that's your decision on how you want

17   to do on that, how much you want to or not want to develop

18   that aspect of the testimony.

19           MR. HOLLENHORST:  Your Honor, counsel during the

20   break will confer on this precise point and then we'll get

21   back to the Court on that.

22           THE COURT:  You folks know this area in all candor

23   better that be I do so, you know, I'm sure -- well, why

24   don't you confer and tell me how you want to do that.

25           MR. HOLLENHORST:  Thank you, Your Honor.

1            THE COURT:  Well, I think that's the point.

2            I mean, I would be somewhat surprised, I don't

3     think the defense is making the argument that, oh, there

4     were no gun -- firearms there, something like that.  And I

5     don't think they're even disputing --

6            THE INTERPRETER:  I'm sorry, Your Honor.

7            Could you please repeat that last comment of

8     yours.  I apologize.

9            THE COURT:  I said that I can't assume what

10    exactly what the defendant would argue.

11            However, it'd be somewhat unexpected if the

12    argument were somehow that there were no firearms found

13    there and, in fact, there's probably an agreement the

14    firearms when they were found were in that cabinet and that

15    the issue that I was raising is, well, there could be an

16    issue of that cabinet, was it open or not already, was it

17    closed?

18            Then even if it's closed, when you -- the duffel

19    bag, could you see the guns in plain view at that point or

20    were they zipped up or what have you?

21            And were the law lies and exactly where the case

22    law lies is obviously something I'll be seeking more in

23    briefs.  But as far as development of the testimony, you

24    know, I'll leave it obviously to experienced counsel on both

25    sides to figure out how they want to approach that.

1            MR. HOLLENHORST:  Thank you, Your Honor.

2            MR. O'BRIEN:  Thank you.

3            THE COURT:  Okay.  Thank you.  All right.

4     Let's -- 15 minutes?

5            THE INTERPRETER:  Your Honor, can -- I don't

6     remember how much time I was asked to set aside for this

7     hearing, but I don't think I expected it to be quite this

8     long and I'm supposed to be in state court for a zoom

9     hearing at 1:00.

10           THE COURT:  Oh.

11           THE INTERPRETER:  So maybe can the break be super

12    short or can we just come back later after, because it's

13    just a short zoom hearing.

14           And I think maybe one of my lawyer friends who has

15    an office nearby will let me go use his office.

16           THE COURT:  Well, if it's -- I think you requested

17    the break so if you think it can be a ten-minute break?

18           THE INTERPRETER:  Five minutes.

19           THE COURT:  Five minute.  Deputy -- Marshals, is

20    that -- five minutes?

21           MARSHAL:  That's fine.

22           THE COURT:  All right.  Five-minute break, folks.

23           THE INTERPRETER:  Thank you.

24           (Recess at 12:21 p.m.)

25           (Reconvene at 12:30 p.m.)

1          THE COURT:  So back on the record, we had to take

2     a brief break.

3          So I understand that Mr. Gomez might want to

4     testify.  But, you know, the more I think about it, it

5     seems to me I might want to have some developing testimony

6     on that cabinet on who saw what.  Otherwise I'm assuming all

7     this other stuff and it just makes our job a lot more

8     difficult.

9          MR. HOLLENHORST:  Okay.  Your Honor, the parties

10    have discussed this issue.

11         The government's position is for briefing purposes

12    we're going to assume that the weapons were in a bag in a

13    cabinet and that the police then opened the bag saw the

14    weapons there.

15         And so we are going to brief that it's legally

16    irrelevant --

17         THE COURT:  Okay.

18         MR. HOLLENHORST:  -- whether or not they were --

19    it was a see-through bag or an opaque bag or whether the

20    weapons were in plain view or not.

21         THE COURT:  Can I ask to clarify something so that

22    -- I don't care what, I just want the facts to play out and

23    we'll make the legal call.

24         Are you willing to stipulate that the bags were in

25    an opaque bag and that all law enforcement officers could

1    not tell if there were or were not guns in that bag?  Were

2    you willing to stipulate to that.

3              MR. HOLLENHORST:  Yes, Your Honor.  And they were

4    not able to tell whether or not there was a tracking device

5    in them, either.

6              MR. O'BRIEN:  They couldn't tell what if anything

7    was inside the bags.

8              MR. HOLLENHORST:  So the legal issue here is they

9    had the authority to search anywhere and everywhere,

10   including closed containers and bags.  They opened up the

11   bag, they found weapons.

12             And we will concede these points that the defense

13   has essentially made concerning whether these bags were  --

14             THE COURT:  Well, what about the thoughts of the

15   officers?  What was in their head when they went ahead and

16   opened the bag?

17             MR. HOLLENHORST:  Not relevant.

18             THE COURT:  Is the defendant willing to stipulate

19   that, in fact, they hadn't found the tracking device and was

20   still looking for the tracking device?

21             MR. HOLLENHORST:  I think the testimony was

22   clear --

23             THE COURT:  Hold on.

24             MR. HOLLENHORST:  I'm sorry.

25             THE COURT:  That's a question for defense.

1          Do you hear what I'm asking?  Is seems to me there

2     could be a -- you know, if -- I mean, the reality is it

3     might be pretty straight forward.  The cops will probably --

4     or the officers will probably say, well, we're still looking

5     for the tracking device but we don't know.  That's something

6     I want to ask of Mr. O'Brien.

7          It seems like the government's willing to say,

8     yeah, the officers could not tell the guns are not in there

9     in a zip, closed and opaque bag, you couldn't see through

10     it.

11          But the other issue is, well, were the officers

12     still just looking for -- when they were -- when they opened

13     the bag at some point under that stip -- you know, under

14     that stipulated fact, when they opened the bag were they

15     still looking for the tracking device?  We don't know that,

16     do we, unless it's stipulated to.

17          MR. O'BRIEN:  My reading of the discovery tells me

18     that the tracking devices were found after the 14th of

19     March.  I might be wrong.

20          THE COURT:  So my question was, at the time the

21     officers unzipped the bag, presumably, were they still

22     looking for the tracking device?  Are you willing to agree

23     to that?

24          MR. O'BRIEN:  Yes.

25          THE COURT:  Okay.  Then I think we're -- just in

1     case, I think I've got everything.

2            MR. HOLLENHORST:  And, Your Honor, during the

3     break I did attempt to see if I could put on another witness

4     here.  And unfortunately many of them have retired.

5            THE COURT:  The stipulation --

6            MR. HOLLENHORST:  Okay.

7            THE COURT:  -- actually tees that up perfectly.

8     I'm mean, I'm not sure where the law lays, guys, but, you

9     know, that's -- I guess that's where we come in.

10           With that then, government's resting?

11           MR. HOLLENHORST:  Yes, Your Honor.

12           THE COURT:  One other house cleaning matter.  We

13    do need an English interpretation of that Government

14    Exhibit 4, is it?

15           MR. HOLLENHORST:  Yes.

16           THE COURT:  You'll follow up with that?

17           MR. HOLLENHORST:  Yes, we will.

18           There was some debate, however, that whether or

19    not it was necessary -- I mean, if the Court wants it, we're

20    going to give it to the Court.  But I'm not so certain that

21    it's contested anything in the tape or that was recorded or

22    am I mistaken there?

23           MR. O'BRIEN:  Well, like, what's in Spanish,

24    isn't, I guess, that important, it's how the translation

25    comes out because that's what would be presented to a jury.

1           THE COURT:  Yeah, I'd want to see it.

2           MR. HOLLENHORST:  Oh.  We'll definitely get the

3   transcript.

4           THE COURT:  Oh, yeah.

5           MR. HOLLENHORST:  The question is whether it's

6   relevant for purposes of the motions hearing?

7           THE COURT:  Well --

8           MR. HOLLENHORST:  If the Court wants it --

9           THE COURT:  Yeah, yeah.

10          MR. HOLLENHORST:  Okay.  Yes, Your Honor.

11          THE COURT:  Just so we can --

12          MR. HOLLENHORST:  Yeah.  By way of explanation,

13  you probably don't want one, but the -- this thing has been

14  sent off to some far-off place for translation.  I have been

15  very adamant with the case agent to get it to me as soon as

16  possible.  I will try to get it to the Court as soon as

17  possible.

18          THE COURT:  Okay.  With that, government -- and I

19  assume, Mr. O'Brien, you're fine once they get it

20  translated, you'll review it and if it's okay they can just

21  submit it to the Court and copy defense, obviously, on it?

22          MR. O'BRIEN:  Yes.

23          THE COURT:  Okay.  All right.  Then with that, the

24  government rests?

25          MR. HOLLENHORST:  We rest, Your Honor.

```
 1                THE COURT:  Okay.  Mr. O'Brien?

 2                MR. O'BRIEN:  Defense calls Santos Gomez Perez.

 3                THE COURT:  Okay.  I can do the inquiry when he's

 4     up here.

 5                MR. O'BRIEN:  Sure.

 6                THE COURT:  Okay.  Come on up.

 7                Oh, actually, can he just stay there?  Yeah, that

 8     would be great.  Just go ahead and stay there.  Okay.

 9                Sir, do you swear to tell the truth, the whole

10     truth and nothing but the truth, sir?

11                THE DEFENDANT:  I do.  Correct.  I swear.

12                THE COURT:  Okay.  Thank you.

13                And could you state your name for the record,

14     please?

15                THE DEFENDANT:  Santos Gomez Perez.

16                THE COURT:  And, Mr. O'Brien, you want do an

17     inquiry for me?

18                MR. O'BRIEN:  Thank you.

19                        (Santos Gomez Perez)

20                             EXAMINATION

21     BY MR. O'BRIEN:

22     Q.  Mr. Gomez, of course we're talking about March 14th or

23     2019?

24                THE COURT:  We got to do a waiver -- a brief

25     waiver of understanding.
```

1    BY MR. O'BRIEN:

2    Q.  Mr. Gomez, you understand that by giving testimony that

3    you were placed under oath?

4    A.  Yes.

5    Q.  And you've sworn to tell the truth?

6    A.  Correct.

7    Q.  And do you understand there are adverse consequences if

8    you do not tell the truth?

9    A.  Correct.  I understand.

10   Q.  Do you understand that what you say can be used against

11   you for the future court proceedings?

12   A.  I understand.

13   Q.  Whether you tell the truth or whether you lie?

14   A.  I understand.

15              THE COURT:  I can take it up.

16              You understand you have a right to remain silent

17   and not answer any questions if you want to; is that

18   correct?

19              THE DEFENDANT:  Correct.  I understand.

20              THE COURT:  And are you deciding that you do want

21   to testify here?

22              THE DEFENDANT:  Yes.

23              THE COURT:  And have you talked about that

24   decision with Mr. O'Brien, your attorney?

25              THE DEFENDANT:  Yes.

1              THE COURT:  And after that do you still want to

2      testify and address the Court?

3              THE DEFENDANT:  Yes.

4              THE COURT:  And you understand that after you

5      testify Mr. Hollenhorst will get to cross-examine you?

6              THE DEFENDANT:  I understand.

7              THE COURT:  And that, in fact, in future

8      proceedings, for example, if -- for example, if you testify

9      that this information can be used for cross-examination and

10     other purposes?

11             THE DEFENDANT:  I understand.

12             THE COURT:  Okay.  And are you hear with a clear

13     head?

14             THE DEFENDANT:  No.  I've got some troubles with

15     headaches and because of the situation.

16             THE COURT:  Are you thinking clearly?

17             THE DEFENDANT:  With the troubles I've got with my

18     headache, no, it's not really correct.  It is difficult.

19             MR. O'BRIEN:  Maybe if I just have a moment, Your

20     Honor?

21             THE COURT:  Yes.  I mean, is he seeking a

22     competency hearing?

23             (Off-the-record discussion.)

24             THE DEFENDANT:  I apologize.  I apologize.  If

25     you'll give me the chance to calm down a little bit and a

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1     little bit later on I'll be more calm.

2             MR. O'BRIEN:  I've explained to Mr. Gomez that

3     with respect to this hearing, to this suppression motion, he

4     will not have another chance to testify.  I've told him that

5     if he wishes to access his right to trial that he would have

6     the right to testify at trial.

7             THE COURT:  How much time are you looking before

8     you're clearheaded?

9             THE DEFENDANT:  I have no idea what the procedure

10    is like or how much time I might be able to get, I don't

11    know.

12            THE COURT:  No.  My question is -- my question

13    related to, I asked you if you were here with a clear head.

14            In other words, earlier in the examination while

15    Mr. O'Brien was defending you in his questioning he was at

16    least implying that there could be an issue of your being

17    under the influence, for example, of meth that affected your

18    ability to give consent and so forth.

19            So what I want to know is you're giving -- you're

20    answering my questions now about whether you understand that

21    you are giving up your right to remain silent that later on

22    that you don't claim that in essence, oh, I wasn't thinking

23    clearly and therefore what I said -- to the extent it may be

24    used against you that, oh, it shouldn't be because my head

25    wasn't clear because the stress or drugs or, you know,

1    alcohol, what have you.  Obviously that's what I'm trying to

2    get at.

3              THE DEFENDANT:  It's hard for me to explain to you

4    guys.  I come back here from Mexico.  I apologize.  I was

5    beaten up --

6              THE INTERPRETER:  But I don't understand what he

7    said before.

8              THE DEFENDANT:  I was kidnapped by some police

9    officers in Mexico.  They kidnapped me.  They beat me up.

10             THE COURT:  Okay.  Sir.

11             THE DEFENDANT:  They put plastic over my head --

12             THE COURT:  Sir, do you want to talk to Mr.

13   O'Brien?  Because in essence you're giving up your right to

14   be silent by blurting out this information.

15             Do you understand that?

16             (Off-the-record discussion.)

17             THE INTERPRETER:  Your Honor, I know that federal

18   court normally trumps state court but I do have a short

19   hearing in state court at 1:00 and if I miss it they will

20   never call me again.

21             THE COURT:  Are you supposed to physically be

22   there or?

23             THE INTERPRETER:  No, it's a zoom hearing.

24             THE COURT:  How long does it take you to set up

25   your zoom?

1           THE INTERPRETER:  I mean, if you guys had a

2    computer that I could sit at it's a --

3           THE COURT:  What were you intending to do?

4           THE INTERPRETER:  It's just I'm interpreting a

5    zoom hearing.

6           THE COURT:  No, no.  But what if -- you don't have

7    laptop device?  You were planning on using one of the

8    court's all along or what?

9           THE INTERPRETER:  I'm sorry, Your Honor.  I didn't

10   know this hearing was going to be this long.  I'm sorry.

11          MR. O'BRIEN:  We're done by the way.  We rest.

12          THE COURT:  Okay.  I guess, Mr. Gomez, have you

13   decided you don't want to testify at this time?

14          THE DEFENDANT:  Not at this time.

15          THE COURT:  Okay.  And that's your decision after

16   talking to Mr. O'Brien, is that right?

17          THE DEFENDANT:  Correct.

18          THE COURT:  Okay.  All right.

19          Other than obviously the stress of the moment have

20   you taken any illegal drugs or alcohol or anything that

21   affects your ability to think before this hearing?

22          THE DEFENDANT:  No, sir.

23          THE COURT:  Only.  Very well.

24          Then I respect that decision and thank you,

25   counsel.

1          And with that, are you otherwise resting, defense?

2          MR. O'BRIEN:  Yes, Your Honor.

3          THE COURT:  Okay.  And just clear for the record,

4     obviously to the extent there's any time pressures on the

5     interpreter, we would address that by getting another

6     interpreter and continuing that, and that has no bearing on

7     the Court's analysis.

8          I assume that isn't affecting your decision at

9     this time, Mr. Gomez?

10          THE DEFENDANT:  No.

11          THE COURT:  Okay.  Very well.

12          All right.  Anything else from government?

13          MR. HOLLENHORST:  Just a briefing schedule, Your

14     Honor.

15          THE COURT:  We can go off the record for that,

16     then.

17          MR. HOLLENHORST:  Thank you, Your Honor.

18          (Off-the-record discussion.)

19          THE COURT:  Okay.  For the record, Madam Law

20     Clerk, could you put the dates on the record.

21          THE CLERK:  So we'll have a transcript

22     February 18th.  Defense brief March 7th, government brief

23     March 22nd.

24          MR. O'BRIEN:  Okay.

25          THE COURT:  Okay.  Thank you.  Good luck to both

1    sides, Mr. Gomez (speaking Spanish).

2               THE DEFENDANT:  Thank you, Your Honor.

3               THE COURT:  All right.  We are in recess.  Thank

4    you everyone.

5               *                *                *

6

7                       **REPORTER'S CERTIFICATE**

8

9

10              I certify the foregoing pages of typewritten
     material constitute a full, true and correct transcript of
     my original stenograph notes, as they purport to contain, of
11   the proceedings reported by me at the time and place
     hereinbefore mentioned.

12

13                   /s/Lynne M. Krenz
                     Lynne M. Krenz, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25