## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                     Case No. 19-cr-313 (ECT/TNL)

             Plaintiff,

v.                                                            **REPORT & RECOMMENDATION**

Santos Gomez Perez,

             Defendant.

Thomas M. Hollenhorst, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN (for the Government); and

Kevin M. O'Brien, 7101 York Avenue, Suite 340, Edina, MN 55435 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Santos Gomez Perez's Motion for Suppression of Evidence from Search and Seizure, ECF No. 52, and Motion for Suppression of Statements, ECF No. 53. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Eric C. Tostrud, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on February 3, 2022. ECF No. 60. Thomas M. Hollenhorst appeared on behalf of the United States of America (the "Government"). Kevin M. O'Brien appeared on behalf of Defendant. Post-hearing briefing is now complete, and this motion is ripe for a determination by the Court.

1

## II. FINDINGS

The Court heard testimony from Sergeant Rigoberto Aguirre of the St. Police Department.  The Government offered and the Court received Government Exhibit 1, the application, search warrant, and receipt, inventory, and return for the search of an auto shop for mobile tracking devices [hereinafter "Tracking Device Warrant"]; Exhibit 2, the application, search warrant, and receipt, inventory, and return, for a search of the same auto shop for firearms among other things [hereinafter "Firearm Warrant"]; Exhibit 3, a rights advisory certificate[1] in the Spanish language; and Exhibit 4, Defendant's recorded statement[2] made in the Spanish language on March 15, 2019.  Following the hearing, an English-language translation[3] of Defendant's recorded statement was provided by the Government via e-mail, copying defense counsel.  These translations[4] have been deemed Exhibits 4A and 4B.  Tr.  88:12-89:22; *see* Tr. 8:7-9:9.  Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### A.  March 14, 2019

Sergeant Aguirre has been with the St. Paul Police Department for more than 15 years.  Tr. 16:18-21.  On March 14, 2019, Sergeant Aguirre was assigned to the narcotics

---

[1] This document is dated both March 14 and March 15, 2019.  *Compare* top of Ex. 3 ("Fecha  March 15, 2019  ") *with* bottom of Ex. 3 ("Fecha  3/14/19  ").  There appears to be no dispute that this form was the one used in connection with the March 15, 2019 interview of Defendant.
[2] In his Motion for Discovery, ECF No. 51, Defendant requested a copy of this recording.  In its pre-hearing response to Defendant's motions, the Government stated that the recording had since been provided to Defendant.  ECF No. 56 at 3.  At the hearing, Defendant confirmed receipt of the recorded statement.  Tr. 8:7-24, ECF No. 62.  Although the hearing transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redaction was due February 23, 2022, and no such notice was filed.  ECF No. 62.
[3] The Court notes that defense counsel speaks Spanish.  *See* Tr. 9:10-18.
[4] There are two parts to the statement.  Tr. 52:10-25.

unit "as a supervisor." Tr. 16:25-17:3. As part of his supervisory duties that day, Sergeant Aguirre participated in the search of an auto shop located in Minneapolis, Minnesota. Tr. 17:4-19; *see generally* Tracking Device Warrant. The search was for purposes of locating tracking devices that had been placed on two vehicles. *See* Tr. 18:8-14; *see generally* Tracking Device Warrant App. The devices had "disappeared" and were believed to be taken off the vehicles at the auto shop. Tr. 18:12-16; *see* Tr. 54:2-55:8. Sergeant Aguirre testified that the particular tracking devices in question were rectangular-shaped; approximately "5 inches by 4 inches, maybe 2 inches thick"; and resembled "a black box." Tr. 18:22-19:3. The tracking devices were "small enough to fit into a metal filing cabinet or some other type of cabinet." Tr. 19:4-6.

Approximately ten law enforcement officers participated in the search of the auto shop. Tr. 19:15-20. The door they used to enter the auto shop was unlocked. Tr. 58:5-9. The officers entered with their service weapons drawn. Tr. 63:16-18. The auto shop was in a "big building" with sections such that the portion being searched had "its own front door." Tr. 19:22, 21:13-17; *see* Tr. 57:16-18. Sergeant Aguirre testified that, "[w]hen you first walk in the door[,] there's a small lobby that you can walk through." Tr. 21:19-20; *see* Tr. 58:24-59:9, 63:2-8. Another door off the lobby goes to an open, garage area. Tr. 21:21-23; *see* Tr. 63:2-8. The garage was large, and Sergeant Aguirre estimated the garage could hold "somewhere in the area of 10, 15 cars." Tr. 21:23-24; *see* Tr. 22:9-10, 60:15-17. There were approximately eight vehicles in the garage. Tr. 22:6-8. There were tools and "various cabinets, containers, [and] boxes of all sorts all over." Tr. 22:2-4, 17-18; *see* Tr. 60:18-20, 67:6-8. Sergeant Aguirre testified that the garage "was a little

3

bit overrun by vehicles and gear and everything." Tr. 22:4-5.

### 1. Defendant Detained & In Custody

Law enforcement announced their presence and indicated they were there to conduct a search. Tr. 23:11-14. Two people, one of whom was Defendant, were located right away, either in the lobby area or by the front door. Tr. 23:14-16, 24:7-10; *see* Tr. 59:14-60:1. At least one additional person was located in the garage. Tr. 23:16-17. All three individuals were handcuffed for officer safety. Tr. 24:11-20, 76:14-15. Defendant was handcuffed on the floor. Tr. 64:6-9. At the time, Defendant was also suspected of having engaged in drug-trafficking activities. Tr. 24:21-24. There is no dispute that Defendant was in custody and detained as of this point in time. Tr. 24:25-3. Law enforcement began to search for the tracking devices, including in cabinets and boxes. Tr. 25:4-14; *see* Tr. 66:24-67:5.

### 2. Conversation with Sergeant Aguirre

Sergeant Aguirre was subsequently informed that Defendant wanted to speak with him. Tr. 25:16-19, 75:19-24; *see* Tr. 26:12-14. Sergeant Aguirre met with Defendant in the garage. Tr. 25:20-22. Defendant was still handcuffed at the time and other law enforcement officers were present "with firearms[,] wearing vests that identif[ied] them as police." Tr. 25:23-26:7.

It was approximately early afternoon when Sergeant Aguirre spoke with Defendant. Tr. 28:9-10. Sergeant Aguirre spoke with Defendant in Spanish. Tr. 29:21-23, 30:13-15. Sergeant Aguirre testified that he considers himself fluent in Spanish and grew up speaking Spanish with and learning Spanish from his parents, who "are native

Spanish speakers from Mexico." Tr. 30:1-10. On cross-examination, Sergeant Aguirre agreed that he was not a certified interpreter. Tr. 74:6-8. Sergeant Aguirre testified that he felt he understood what Defendant was communicating to him. Tr. 30:16-18. No recording was made of the conversation between Sergeant Aguirre and Defendant. Tr. 33:7-11, 72:14-15. Sergeant Aguirre did not advise Defendant of his *Miranda* rights before speaking with him at the auto shop. Tr. 71:9-13.

At the hearing, Sergeant Aguirre testified as to the substance of the conversation he had with Defendant in Spanish. Tr. 30:19-21. Sergeant Aguirre testified that Defendant "wanted an opportunity to get out of trouble." Tr. 28:15-18; *see also* Tr. 27:20-21. At the time, Defendant was aware that he had been arrested in connection with narcotics. Tr. 26:23-27:2, 75:25-76:5; *see* Tr. 64:24-65:9. Sergeant Aguirre testified that it was "very common" for someone to "want to trade information in exchange for some kind of prosecutorial help or just not being arrested that particular day." Tr. 26:19-22; *see also* Tr. 27:17-19. Sergeant Aguirre testified that "it was clear to [him] when [he] approached [that Defendant] wanted to offer information." Tr. 29:15-16. Sergeant Aguirre did not ask any questions before Defendant began speaking to him. Tr. 29:5-15, 31:16-18.

Defendant told Sergeant Aguirre "that he knew of a place, and not this garage, that had a – various amounts of firearms that were delivered to him that were supposed to be transported or . . . concealed and taken over to Mexico." Tr. 27:22-25; *see also* Tr. 28:11-18. Defendant "wanted to give that information and help [law enforcement] by getting a phone call and leading [law enforcement] to those firearms," Tr. 27:25-28:2.

Sergeant Aguirre suspected the firearms in question were "illegal firearms and at least they were going to be transferred out of the country and into Mexico." Tr. 28:2-4; *see* Tr. 28:19-20.

Sergeant Aguirre asked Defendant where the firearms were located in order to "get more of a sense of . . . what information he[ was] really trying to provide." Tr. 28:21-29:2; *see* Tr. 31:23-32:5. Sergeant Aguirre asked Defendant "follow[-]up questions to clarify" where the firearms were being transported to and Defendant indicated they were going to Mexico. Tr. 32:15-17; *cf.* Tr. 71:18-72:13. When Sergeant Aguirre asked where the firearms were located, Defendant "said another location." Tr. 32:18-19; *cf.* Tr. 71:18-72:13. Defendant "also mentioned that he needed to receive a phone call from Mexico, specifically from Guadalajara." Tr. 32:24-33:1. Their conversation lasted for approximately "two to three minutes." Tr. 31:21-22. Sergeant Aguirre testified that Defendant was not being investigated for firearms trafficking at the time of their conversation. Tr. 34:1-4.

After getting this initial information from Defendant, Sergeant Aguirre "stepped away . . . to . . . process the information that [he] was receiving." Tr. 34:9-15. He spoke to other law enforcement officers about what should be done with the information provided. *See* Tr. 34:13:-25. Sergeant Aguirre then began walking back towards Defendant. Tr. 34:25-35:3. Defendant was standing next to the garage door and had full view of the entire garage. Tr. 35:1-3. As Sergeant Aguirre was walking towards Defendant, Defendant's "eyes—his facial expression changed, almost like a surprise or a nervousness." Tr. 35:3-5. Sergeant Aguirre then heard someone call for a camera. Tr.

6

35:5-6.   Sergeant Aguirre testified that, in his line of work, when he hears the word "camera," it "means that something has been found that needs to be documented and pictured."   Tr. 35:5-8.   Defendant then "started walking toward [Sergeant Aguirre] in handcuffs saying, I'm just going to show you."   Tr. 35:10-13; *see* Tr. 35:21-36:1, 36:12-15 ("I'm going to show you.   I'll just show you.   Something to that extent.").   Approximately "three to five minutes" passed between when Sergeant Aguirre stepped away from Defendant and these subsequent events.   Tr. 77:16-19; *see* Tr. 36:6-9 ("two to four minutes"); *see also* Tr. 36:11 ("It was short.").

### 3.  Discovery of Firearms at the Auto Shop

One of the cabinets was in the center of the garage.   Tr. 22:19-25; *see* Tr. 37:21-24.   Defendant began walking toward Sergeant Aguirre "in the direction of the cabinet area."   Tr. 35:23-25.   Sergeant Aguirre stopped Defendant and directed him "to back up."   Tr. 36:19-20.   Law enforcement officers informed Sergeant Aguirre that firearms had been found in the cabinet in some large, opaque duffle bags.   Tr. 36:21-37:9, 40:24-41:16, 68:24-69:7, 77:20-24, 78:4-79:5.   For purposes of the instant motions, the parties agreed "to assume that the [firearms] were in a bag in the cabinet and that [law enforcement] then opened the bag [and] saw the [firearms] there" and were still looking for the tracking devices at the time the bag was opened.   Tr. 85:9-87:7.   A warrant was subsequently obtained for the firearms.   *See generally* Firearm Warrant.   More than 10 firearms were seized, including handguns and "long guns."   *See* Tr. 38:5-10, 39:22-25, 40:24-41:2, 43:10-44:12; *see also* Firearm Warrant Receipt, Inventory and Return.

**B.  March 15, 2019**

The following day, Sergeant Aguirre was asked to assist in interviewing Defendant at the Ramsey County Jail.  Tr. 44:23-45:5.  The interview took place in early afternoon.  Tr. 45:10-12.  Sergeant Aguirre, another law enforcement officer, and Defendant were in a room at the jail, approximately 12 feet by 12 feet, with a table and four or so chairs.  Tr. 45:6-9.  Sergeant Aguirre and the other law enforcement officer were dressed in plainclothes and neither of them had his service weapon.  Tr. 45:16-24.

The interview was recorded and conducted in Spanish.  Tr. 47:2-10; *see generally* Ex. 4.  Sergeant Aguirre read Defendant his *Miranda* rights in Spanish from a standard police form.  Tr. 47:11-13, 17-25; *see* Ex. 4A at 4-5; *see generally* Ex. 3.  There is no dispute that the form contained a correct translation.  *See* Tr. 49:18-19.  Defendant initialed next to each advisory statement.  Tr. 48:20-49:5; *see generally* Ex. 3.  Defendant also signed his name at the bottom of the form.  Tr. 49:6-8; *see generally* Ex. 3.  Sergeant Aguirre signed the form as well.  Tr. 49:9-11; *see generally* Ex. 3.  By initialing and signing the form, Defendant indicated that he was willing to answer questions.  Tr. 50:2-5.  Sergeant Aguirre interviewed Defendant for approximately half an hour, during which Defendant made incriminating statements about his involvement with the firearms.  Tr. 50:6-16; *see generally* Exs. 4, 4A, 4B.

Sergeant Aguirre testified that Defendant appeared "normal, relaxed," "baseline." Tr. 45:25-46:3, 74:1-5; *see* 46:6-10.  His answers appeared responsive to the questions asked.  Tr. 46:11-14.  No threats were made by Sergeant Aguirre.  Tr. 46:15-17; *see* Tr. 51:14-16.  Sergeant Aguirre further testified that the entire interview was captured on the

recording.  Tr. 47:14-16, 51:17-21, 52:4-9, 53:1-10, 74:12-17.

## III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law.

### A.  Motion for Suppression of Evidence from Search and Seizure

Defendant moves to suppress the firearms obtained from the auto shop where he worked.  "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting U.S. Const. amend. IV).  "[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).

"It is well-established that 'Fourth Amendment rights are personal rights that may not be asserted vicariously.'" *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004)); *see, e.g.*, *United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019) ("Only those with a reasonable expectation of privacy in the place searched may bring a Fourth Amendment challenge."); *see also Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." (quotation omitted)).  "An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]'" *Barragan*, 379 F.3d at 529

(quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)); *see, e.g.*, *United States v. Sierra-Serrano*, 11 F.4th 931, 933 (8th Cir. 2021); *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017).  "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134.

"The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." *Russell*, 847 F.3d at 618 (quotation omitted); *see, e.g.*, *Sierra-Serrano*, 11 F.4th at 933; *United States v. Mosley*, 878 F.3d 246, 255 (8th Cir. 2017).  "A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched has no standing to claim that they were searched illegally." *Anguiano*, 795 F.3d at 878 (quotation omitted); *see, e.g.*, *Russell*, 847 F.3d at 618; *Barragan*, 379 F.3d at 530.

Defendant asserts that, as an employee of the auto shop, he "had a reasonable expectation of privacy in his place of work."  Def.'s Mem. in Supp. at 7, ECF No. 63.  "An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987); *see Carter*, 525 U.S. at 90 ("Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property.").  An "employee's expectation of privacy must be assessed in the context of the employment relation." *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987).  "[T]he relationship or 'nexus' of the employee to the area searched is an important consideration in determining

whether the employee has standing." *United States v. Anderson*, 154 F.3d 1225, 1230 (10th Cir. 1998). "Courts routinely look to whether the premises being searched have included the offices or work area of the party seeking to suppress." *United States v. Najarian*, 915 F. Supp. 1441, 1451 (D. Minn. 1995); *see, e.g.*, *O'Connor*, 480 U.S. at 715-19; *Mancusi v. DeForte*, 392 U.S. 364, 367-70 (1968); *see also Anderson*, 154 F.3d at 1229-33. "The greater degree of exclusivity and control over a work area, and the more time a defendant spends there, the more likely standing is to be found . . . . By contrast, the less private a work area—and the less control a defendant has over that work area—the less likely standing is to be found." *Najarian*, 915 F. Supp. at 1452 (alteration in original) (quoting *United States v. Hamdan*, 891 F. Supp. 88, 94-95 (E.D. NY. 1995)); *accord United States v. Lisbon*, 835 F. Supp. 2d 1329, 1343 (N.D. Ga. 2011). "[W]hether an employee has a reasonable expectation of privacy in a work area 'must be addressed on a case-by-case basis.'" *Najarian*, 915 F. Supp. at 1451 (quoting *O'Connor*, 480 U.S. at 718).

There is no dispute that Defendant does not have an ownership interest in the auto shop. Def.'s Mem. in Supp. at 8. Nor is there any evidence in the record that he had unencumbered access to the auto shop or was able to control who entered the auto shop or accessed the garage. There is no evidence in the record that Defendant was in fact an employee of the auto shop.

Even assuming for sake of argument that Defendant was an employee of the auto shop, there is no evidence in the record that the garage was the equivalent of Defendant's private office space. *Contra Mancusi*, 392 U.S. at 369-70. Defendant asserts that he

"undeniably carried out his profession as a mechanic in the work area of the shop." Def.'s Mem. in Supp. at 8. Defendant has not put forth evidence that the garage or the cabinet in question were for his exclusive use. *Contra O'Connor*, 480 U.S. at 718. There is no evidence in the record that Defendant routinely kept tools or personal items in the cabinet. Nor has Defendant put forth evidence that he took actions to maintain privacy in items placed in the cabinet or restricted the access of others to the cabinet, such as securing it with a lock and key. Likewise, there is no evidence that the cabinet in the garage was under Defendant's immediate control.

Defendant relies on *United States v. Chaves*, 169 F.3d 687 (11th Cir. 1999), in support of his position that he has standing to challenge the search of the auto shop. The issue in *Chaves* concerned standing to challenge the search of a warehouse. 169 F.3d at 690-91. "Although Chaves did not own or formally rent the warehouse, . . . [the Tenth Circuit Court of Appeals found] that his connection to the warehouse was sufficient to establish a reasonable expectation of privacy in the warehouse." *Id.* at 691.

> Chaves had the only key to the warehouse, giving him a measure of control and ability to exclude others. While possession of a key, without more, might not be sufficient to establish a reasonable expectation of privacy, Chaves seems to have had the only key and, what is more, he also kept personal and business papers at the warehouse.

*Id.* (citation omitted). Under these circumstances, the Tenth Circuit "conclude[d] that Chaves was no 'mere guest or invitee,' but instead was much closer to that of one who maintained both 'custody and control' of the warehouse," and therefore held that "the Fourth Amendment protect[ed] Chaves' privacy interests in the warehouse." *Id.*

While the architectural character of the warehouse in *Chaves* and the auto shop and garage in this case may arguably be comparable and neither Chaves nor Defendant owned or formally rented either space, there is where the similarities end.  As stated by the Government, "[t]here is no evidence in this case to suggest [Defendant] even had a key to the premises, which were *unlocked*, or that he had any personal and business records there."  Gov't Mem. in Opp'n at 9, ECF No. 67.

Accordingly, the Court concludes that Defendant has not met his burden to show that he had reasonable expectation of privacy in the auto shop, the garage, or the cabinet.  As a result, Defendant lacks standing to contest the legality of the searches, and the Court therefore recommends that Defendant's motion for suppression of evidence be denied.

### B.  Motion for Suppression of Statements

Defendant also moves to suppress the statements he made on March 14 and 15 to law enforcement as violative of his Fifth Amendment rights.  "The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.'"  *United States v. LeBrun*, 363 F.3d 715, 719-20 (8th Cir. 2004) (quoting U.S. Const. amend. V).  "The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody."  *United States v. Smialek*, 970 F.3d 1070, 1074 (8th Cir. 2020); *accord United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005); *see also Rhode Island v. Innis*, 446 U.S. 291, 297-98 (1980); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

### 1.  March 14 Statements

There is no dispute that Defendant was in custody when Sergeant Aguirre spoke to

him at the auto shop on March 14.    There is also no dispute that Defendant was not advised of his *Miranda* rights before Sergeant Aguirre spoke with him that day. Defendant asserts that Sergeant Aguirre's questions amounted to an interrogation and his custodial statements "were not voluntary and . . . the product of coercion."  Def.'s Mem. in Supp. at 4; *see also* Def.'s Mem. in Supp. at 1.

### a.  Not Subject to Interrogation

"[N]ot all government inquiries to a suspect in custody constitute interrogation and therefore need be preceded by *Miranda* warnings."  *United States v. Tapia-Rodriguez*, 968 F.3d 891, 894 (8th Cir. 2020) (quotation omitted).  "Interrogation occurs when a law enforcement officer engages in 'either express questioning or its functional equivalent,' which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  *United States v. Hernandez-Mendoza*, 600 F.3d 971, 976 (8th Cir. 2010) (quoting *Innis*, 446 U.S. at 300-01); *accord Smialek*, 970 F.3d at 1073.  "The 'should have known' standard is objective and 'focuses primarily upon the perceptions of the suspect, rather than the intent of the police.'"  *Tapia-Rodriguez*, 968 F.3d at 894 (quoting *Innis*, 446 U.S. at 301).

"[C]ustodial statements made on the suspect's own initiative are not subject to the safeguards of *Miranda*."  *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989); *see also Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment . . . ."); *Hernandez-Mendoza*, 600 F.3d at 977 ("Voluntary statements not in response to an interrogation, however, are admissible with or without *Miranda*

warnings." (quotation omitted)); *United States v. Withorn*, 204 F.3d 790, 796 (8th Cir. 2000) ("We have repeatedly held that a voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings." (quotation omitted)). Nor does *Miranda* "bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by . . . [a law enforcement] officer." *Chipps*, 410 F.3d at 445; *see Butzin*, 886 F.2d at 1018. Similarly, while "[a] request for clarification of a spontaneous statement generally does not constitute interrogation," "[a] question would constitute interrogation if it attempted to enhance [the suspect's] guilt." *Chipps*, 410 F.3d at 445 (quotation omitted); *see United States v. Becerra*, 958 F.3d 725, 729 (8th Cir. 2020) ("[E]ven follow-up questions can amount to interrogation if their point is to enhance the defendant's guilt." (quotation omitted)).

Here, Defendant approached law enforcement and requested to speak with Sergeant Aguirre. *See Withorn*, 204 F.3d at 796; *United States v. Koontz*, 143 F.3d 408, 411 (8th Cir. 1998). Sergeant Aguirre did not ask any questions of Defendant before Defendant volunteered information about the firearms and their transportation to Mexico. *See, e.g.*, *Butzin*, 886 F.2d at 1018; *see also Miranda*, 384 U.S. at 478. Defendant argues that Sergeant Aguirre's follow-up questions as to the location of the firearms and where they were going were the sorts of questions law enforcement should know were reasonably likely to elicit an incriminating response from him. The Eighth Circuit Court of Appeals, however, has "held that, for *Miranda* purposes, statements made in response to a law enforcement officer's attempt to seek clarification of a defendant's remarks,

during an interview requested by the defendant, are not the products of interrogation." *Koontz*, 143 F.3d at 411 (quotation omitted); *see Butzin*, 866 F.2d at 1018.  Nor did Sergeant Aguirre expand the scope of Defendant's volunteered statement.  *See Becerra*, 958 F.3d at 729; *see also Chipps*, 410 F.3d at 445.  Moreover, the Court credits Sergeant Aguirre's testimony that Defendant volunteered the information regarding the firearms in an effort to "get out of trouble" and his follow-up questions were intended to discern the nature of the information Defendant was offering to provide.  *See Koontz*, 143 F.3d at 411 ("It is clear to us from the agent's testimony at the hearing . . . that his questions about quantity were also intended to discover sufficient information to convince the federal prosecutor that 'it [was] worth our while' to accept Mr. Koontz's offer to cooperate with the government by making drug purchases from other methamphetamine dealers." (second alteration in original)).  And, once Defendant saw that the firearms had been found, "it was the discovery of . . . [the firearms themselves], not police coercion, that induced" his remaining statements.  *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996).

Based on the foregoing, the Court concludes that Defendant was not subject to interrogation by Sergeant Aguirre at the auto shop on March 14.

### b.  Statements Were Voluntary

Defendant additionally argues that his statements were the product of coercion, and therefore involuntary.  "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  *LeBrun*, 363 F.3d at 724 (quotation

16

omitted); *accord United States v. Magallon*, 984 F.3d 123, 1284 (8th Cir. 2021); *United States v. Howard*, 532 F.3d 755, 759 (8th Cir. 2008). "Whether a confession is involuntary is judged by the totality of the circumstances."[5] *LeBrun*, 363 F.3d at 724; *accord Magallon*, 984 F.3d at 1284; *Howard*, 532 F.3d at 759. In determining the voluntariness of a statement, "[t]he court must look at the conduct of the officers and the characteristics of the accused." *LeBrun*, 636 F.3d at 724; *see Magallon*, 984 F.3d at 1284 (examining "both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure" (quotation omitted)). "Factors include 'the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.'" *Magallon*, 984 F.3d at 1284 (quoting *Boslau*, 632 F.3d at 428). "Whatever the facts of an individual case, [the court's] polestar always must be to determine whether or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination." *LeBrun*, 363 F.3d at 725. "This is a very demanding standard . . . ." *Id.* at 726.

Defendant argues that, because "he was in custody, [he] was subject to reinforcing pressure of custody and interrogation which overcame his will." Def.'s Mem. in Supp. at 4. As stated in Section III.B.1.a, however, the Court has concluded that Defendant was not subject to interrogation by Sergeant Aguirre at the auto shop on March 14. Further, in *Miranda*, the Supreme Court noted that

---

[5] "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *LeBrun*, 363 F.3d at 724; *accord United States v. Boslau*, 632 F.3d 422, 429 (8th Cir. 2011). The Government has not addressed Defendant's argument that his March 14 statements were the product of coercion and therefore involuntary. *See* Gov't's Mem. in Opp'n at 14-15.

> [t]he fundamental import of the privilege while an individual
> is in custody is not whether he is allowed to talk to the police
> without the benefit of warnings and counsel, but whether he
> can be interrogated.  There is no requirement that police stop
> . . . a person who calls the police to offer a confession or any
> other statement he desires to make.  Volunteered statements
> of any kind are not barred by the Fifth Amendment and their
> admissibility is not affected by our holding today.

384 U.S. at 478.  Later, in *Innis*, the Supreme Court looked to *Miranda* itself for the

proposition that not "all statements obtained by the police after a person has been taken

into custody are to be considered the product of interrogation."  446 U.S. at 299.  The

Supreme Court went on to state:

> It is clear therefore that the special procedural safeguards
> outlined in *Miranda* are required not where a suspect is
> simply taken into custody, but rather where a suspect in
> custody is subjected to interrogation.   "Interrogation," as
> conceptualized in the *Miranda* opinion, *must reflect a*
> *measure of compulsion above and beyond that inherent in*
> *custody itself.*

*Id.* at 300 (emphasis added) (footnote omitted).

Defendant goes on to state that it is disputed whether he initiated contact with

Sergeant Aguirre.   Defendant argues that "Sergeant Aguir[r]e's claim that [he,

Defendant,] initiated contact is subject to doubt due to the numerous questions that

[Sergeant Aguirre] initiated to [him]."  Def.'s Mem. in Supp. at 5.  The Court finds

credible Sergeant Aguirre's testimony that it was Defendant who requested to speak with

him, initiated the conversation, and volunteered the information regarding the firearms in

an effort to "get out of trouble."  Indeed, at the time Defendant initiated the conversation

with Sergeant Aguirre, he was not being investigated for firearms offenses.

18

Defendant also points to "his lack of English skills and his drug problem." Def.'s Mem. in Supp. at 5. Notably, the conversation between Defendant and Sergeant Aguirre was in Spanish, not English. Likewise, Defendant "points to nothing in the record indicating that his state of intoxication was so severe his will was overborne." *Howard*, 532 F.3d at 763; *see United States v. Annis*, 446 F.3d 852, 856 (8th Cir. 2006) ("Annis provided no evidence that his pain and meth withdrawal caused his will to be overborne.").

In sum, Defendant initiated the conversation with law enforcement on March 14 and his entire interaction with Sergeant Aguirre was over in less than 10 minutes. Defendant and Sergeant Aguirre, who is himself fluent in Spanish, spoke in Spanish, not English. There is no evidence that Sergeant Aguirre or any other law enforcement officer at the scene exerted pressure on Defendant to speak with them or coerced him in any way. While Defendant was in custody at the time of his conversation with Sergeant Aguirre, the totality of the circumstances do not suggest, let alone compel, the conclusion that Defendant's will was overborne and his capacity for self-determination critically impaired. Accordingly, the Court concludes that Defendant's statements on March 14 were voluntary.

### 2. March 15 Statements

Lastly, Defendant seeks suppression of the statements he made during the interview with Sergeant Aguirre and another law enforcement office on March 15 at the Ramsey County Jail. Defendant asserts that "[t]he questioning done by Sergeant Aguirre at the police station was done as a follow[-]up to information obtained the previous day

in violation of [his] right to be free from coerced questioning." Def.'s Mem. in Supp. at 5. Defendant argues "[a] second interrogation, albeit with a *Miranda* warning, should be suppressed where it is preceded by a coerced line of questioning." Def.'s Mem. in Supp. at 6 (citing *Missouri v. Seibert*, 542 U.S. 600 (2004)).

First, for the reasons stated in Sections III.B.1.a and .b *infra*, the Court has concluded that Defendant was *not* subject to interrogation or any sort of coercion on March 14.

Second, to the extent Defendant asserts that law enforcement intentionally engaged in a two-step interrogation tactic by speaking with him first at the auto shop without administering *Miranda* warnings and then at the jail the next day with the benefit of *Miranda* warnings in an effort "to circumvent *Miranda* requirements by deliberately delaying the warnings in order to provoke a confession," he did not provide notice to the Government of this argument. *Magallon*, 984 F.3d at 1283 (quotation omitted); *see generally* ECF No. 53. "The defendant must explicitly raise the argument that law enforcement used a two-step interrogation tactic before the prosecution has the burden to prove it did not use such a tactic." *Magallon*, 984 F.3d at 1283; *see also* D. Minn. LR 12.1(c)(1)(B).

Third, Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights by responding to Sergeant Aguirre's questions after being advised of those rights. "Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish the accused 'in fact knowingly and voluntarily waived *[Miranda]* rights'

when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Berghuis*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *accord United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). Courts consider the totality of the circumstances in determining whether a waiver is valid, and the Government bears the burden of proving validity by a preponderance of the evidence. *Vinton*, 631 F.3d at 483; *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

"As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protections those rights afford." *Berghuis*, 560 U.S. at 385; *accord United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights."); *United States v. Soto*, No. 07-cr-0223 (PJS/JSM), 2007 WL 3120816, at *13 (D. Minn. Oct. 23, 2007) ("[A] defendant's willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver."); *United States v. Mandujano*, No. 03-cr-178(2)

(JRT/FLN), 2003 WL 22076577, at *4 (D. Minn. Aug. 22, 2003) ("Waiver can be inferred by conduct, and a willingness to answer questions after acknowledging *Miranda* rights is sufficient to constitute an implied waiver."). "Where the [Government] shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384; *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016).

Defendant has not specifically articulated any purported challenge to the sufficiency of the *Miranda* warning given by Sergeant Aguirre; the voluntariness of the statements made on March 15; or his awareness of the rights he was giving up by choosing to answer Sergeant Aguirre's questions.

There is no evidence that Defendant did not understand his *Miranda* rights. *See Berghuis*, 560 U.S. at 382-83; *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007). Like the conversation that took place at the auto shop, the interview on March 15 was conducted in Spanish, and Defendant was advised in Spanish—both orally by Sergeant Aguirre and in writing through the standard police form—of his *Miranda* rights. Ex. 4A at 4-5; *see generally* Ex. 3. Defendant initialed next to each of those rights on the form, indicating that he understood them. Exs. 3, 4A at 5; Tr. 50:2-5. There is no evidence of diminished capacity. Further, Sergeant Aguirre did not engage in any "intimidation, coercion, or deception" during the March 15 interview. *See Berghuis*, 560 U.S. at 382; *Vinton*, 631 F.3d at 482.

Therefore, the Court likewise recommends that Defendant's motion to suppress

22

statements be denied.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Defendant's Motion for Suppression of Evidence from Search and Seizure, ECF No. 52, be **DENIED**.

2. Defendant's Motion for Suppression of Statements, ECF No. 53, be **DENIED**.


Date: May____3____, 2022                          _____*s/ Tony N. Leung*_____
                                                  Tony N. Leung
                                                  United States Magistrate Judge
                                                  District of Minnesota


                                                  *United States v. Gomez*
                                                  Case No. 19-cr-313 (ECT/TNL)


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.