RECEIVED

SEP 1 9 2022

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No.: 19-CR-313 (ECT/TNL)

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S POSITION** |
| | ) | **WITH RESPECT TO SENTENCING** |
| Santoz Gomez Perez | ) | **AND REQUEST FOR VARIANCE** |
| | ) | |
| Defendant, | ) | |

This memorandum is submitted by Santos Gomez Perez in connection with his sentencing before the Honorable Eric Tustrud. This Sentencing Memorandum will first address the applicable statutory sentencing range and the proper guideline calculations. Second, the memorandum will articulate and outline the basis for defendant, Santos Gomez Perez, request for a downward variance from the advisory sentencing guideline range and why it's consistent with the provision of 18 U.S.C 3553(a).

**REASONABLE SENTENCING, VARIANCE:**

I, Mr. Santos Gomez Perez, stand before this Court as an individual, unique in my own circumstances and human failings.

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States,* 128 S.Ct. 586, 598 (2007), quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).

In *Rita v. United States*, 127 S. Ct. 2456 (2007), *Kimbrough v. United States*, 128 S. Ct. 558 (2007) and *Gall v. United States*, 128 S. Ct. 586 (2007), and also in *Cunningham v. California,* 1278 S. Ct. 856 (2007), the Supreme Court of the United States has made it plainly clear that Section 3553(a) is

SCANNED

SEP 1 9 2022

U.S. DISTRICT COURT ST. PAUL

the controlling sentencing law and rejected the devices that were used after *United States v. Booker,* 543 U.S. 220 (2005) to maintain a *de facto* mandatory guideline sentence.

In *Gall* and *Kimbrough,* the Court recognized that a "deferential abuse-of-discretion standard could successfully *balance* the need to reduce unjustifiable disparities across the nation and consider every convicted person as an *individual*." *Id.* At 598 n.8 (internal quotation marks and citations omitted) (emphasis added). Moreover, by "correctly calculat[ing] and review[ing] the guideline range," a judge "necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall,* 128 S. Ct. At 599.

In *Gall,* the Court not only used the terms "departure" and "variance" interchangeably, *Gall,* 128 S. Ct. At 594, 197, but made no mention whatsoever of the "heartland" concept or the guidelines' restrictions on consideration of individual characteristics. This was so even though the case was all about a below-guideline sentence based on offender characteristics that the guidelines ignore or deem "not ordinarily relevant," including age and immaturity, voluntary withdrawal from the conspiracy, and self-rehabilitation through education, employment, and discontinuing the use of drugs. *Id.* At 598-602. This strongly indicates that the "heartland" concept and the guidelines' restrictive policy statements are no longer relevant, as some Courts of Appeals have held. Indeed, Section 3553(a)(1) requires the sentencing Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" in every case, and the statute trumps any guideline or policy statement to the contrary. See. *Stinson v. United States,* 508 U.S. 36, 38, 44, 45 (1993; *United States v. LaBonte,* 520 U.S. 751, 757 (1997).

*U.S. v. Mireles,* 617 F.3d 1009 (8th Cir. 2010) states that, after consideration of the Supreme Court's directives, "the district Court should ordinarily determine first the appropriate guideline range, then decide if the guidelines permit a traditional departure, and finally determine whether the § 3553 (a) factors justify a variance from this guideline sentence."

**§5H1.1 Age Factor Pursuant to 18 U.S.C. § 3553(a) Factors**

Age (including youth) may be relevant in determining whether a variance (departure) is warranted if consideration is based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is an elderly person. Where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

I, Santos Gomez Perez am a Forty-Six (46) year old defendant which definitely stresses that the significantly lower rate of recidivism for older defendants calls for a lesser period of incarceration as a mitigating factor. Management problems with elderly inmates are intensified in the prison setting. This includes the vulnerability to abuse and predation difficulty in establishing social relationship with younger inmates. The elderly and first time offenders are *"easy prey"* for the more younger experienced predatory inmates. When a defendant is 46 or more years old as I, Santos Gomez Perez am, their health starts to deteriorate. Various types of health problems begin to happen as the older a person becomes and the chances of that person committing another crime is highly unlikely. For these reasons a downward departure and/or variance would be warranted and may be in the best interest of both parties, the Government and the Defendant.

**USSG § 4A1.3 Overstated Criminal History, Pursuant to 18 U.S.C. § 3553(a) Factors**

Defendant, Santos Gomez Perez, when examining his previous criminal history has only one prior felony conviction. In 1996, defendant was arrested and convicted of crossing the border while in possession of marijuana. This record was confirmed by the FBI criminal history report. Defendant was given 30 days detention and a $3500 fine, which he paid, and was then released at the Mexico border. The Court has authority to apply a Sentencing Guidelines variance (departure) for defendants having only one previous felony. *"Downward departure may be warranted, based on seriousness of*

*aggravated felony at issue, if defendant has previously been convicted of only one felony offense, such offense was not crime of violence or firearms offense, and term of imprisonment imposed for such offense did not exceed one year.*" United States v. Palomino-Rivera, 258 F.3d 656 (7th Cir. 2001), cert. denied, 534 U.S. 1147, 122 S. Ct. 1106, 151 L. Ed. 2d 1002 (2002). With this reliable information, defendant believes a departure is warranted under this condition. If reliable information indicates that the defendant's criminal category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure and/or variance may be warranted. Santos Gomez Perez asserts that criminal history category over-represented the seriousness of his criminal history. Accordingly, Santos Gomez Perez, argues that the computation of his criminal history, although calculated by probation, is over bearing and reaches beyond the earnestness of a punishment which may be justified by such calculation. Santos Gomez Perez's prior offense (case# 96-CR-221) includes this case that was committed back in 1996.

## Downward Variance Pursuant to 18 U.S.C. § 3553(a) and USSG § 5H1.3 Mental and Emotional Conditions

The Defendant (Santos Gomez Perez) stress as a mitigating factor, that my mental and emotional conditions arrived from some unfortunate life experiences, situations and circumstances that are relevant in determining whether a variance (departure) is warranted. If such condition, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical case covered by the guidelines then a variance (departure) should be warranted.

## The Defendant Up Bringing, Pursuant to 18 U.S.C. § 3553(a)

The Defendant (Santos Gomez Perez) stresses as a mitigating factor that his upbringing played a big part of his life and had a large impact on the decisions that he made and the direction that his life went in and the way that it turned out.

Defendant states that he grew up in a household where his parents fought almost everyday of the week. His mother had to be hospitalized one time before with serious head injuries from fighting with his father. These fights were due in part because of his mother and father always fighting over money, there simply was no enough. With a shortage of money there was a shortage of food at times. It was hard to provide for the family. The money issue along with other factors contributed to defendants parents becoming separated in 1995. During this separation Mr. Santos's father went back to Mexico and his mother stayed in Minnesota with all six kids while living in the East St. Paul area. In 1995, while living in East St. Paul with his family, defendant (Santos Gomez Perez) made trips to Mexico and would bring back marijuana to sell for profit, over the border, in order to make money to provide for the family. During this time, being an undocumented person, posed a significant obstacle for obtaining good paying jobs. Consequently, defendant was arrested in 1996 (the record indicates July 4th of 1996, case# 96-CR-221) for bringing marijuana over the border. Defendant was held for approximately 30 days, paid a fine of $3500 and was sent back to Mexico immediately following his release.

Defendants permanent resident alien card was confiscated for this criminal conviction. Following his release, defendant stayed in Mexico from 1996 until 2005. In 2005 defendant returned to Minnesota after witnessing many acts of extreme violence in the town where he lived with his now new wife and three young children. Defendant witnessed a young girl being kidnapped, assaulted and murdered right off of the streets where his children played. It was this event that was the catalyst that caused defendant (Santos Gomez Perez) to want to move back to the United States to pursue a calmer and friendlier place to raise his children and young family. Family members in Minnesota helped defendant to find new home and new employment.

**Defendant's Role Models, Pursuant to 18 U.S.C. § 3553(a)**

I, Santos Gomez Perez, have lacked guidance as a youth and never truly had many positive role models in my life. Although my mother and father were together during my childhood development

years, there was a significant lack in resources for my family and so I witnessed a great deal of violence and arguments due to the neighborhood that I lived in and the family dynamic conflicts. When I was only five years old my four year old brother was killed in a car accident. It was this tragedy that permanently injured me emotionally and physically for many years. My family was affected in the same way. They became divided after the death of my little brother so we lost many close family traditions that were typically part of our life and unique to my culture. My mother and sister were in a coma and at the time, they were given a 50% chance of surviving. Because of how this might effect a person that was recovering, we were not able to inform my mother that her baby had died until she was out of danger. We were fortunate to not lose our mother and my sister but this event caused damage to my family that me and my entire family still feel today. Long after this tragic event, I could still feel the affects. I had to learn to console myself and to become independent sooner than I wanted to be, but I was still a child myself. Many times, during the years following my little brothers death, I managed things myself because I felt I had to, my mother and father were still struggling with the loss themselves.

Growing up after the death of my little brother changed the dynamics of our entire household. My mother and father seemed to fight more often and we were noticeably more distant.

**Mental Health and Commitment, Pursuant to 18 U.S.C. § 3553(a)**

Following the tragic loss of my little brother, I experienced many feelings such as depression, failure, and separation from security of a close family. There wasn't help for me back then. I couldn't go to grief and loss therapist and get the help I needed, I was just a child myself. I learned to deal with the loss by not dealing with it. Many years later, I can still feel the loss and the pain of that accident, as if it happened today.

Another event that I still carry with me, after all these years, happened in 2016. My cousin, whom I grew up with, was living in Mexico at the time. We were very close and we did everything

together when we were growing up together. I was told that my cousin was down the street from the house where I grew up, at a neighborhood store. My cousin, Alberto, had gotten into an argument and then a fight with guys that no one recognized or knew from the area. It is assumed that these people were part of one of the local cartels. After the argument and fight, it was witnessed that these people threw him into a car and drove off. My cousin, Alberto, was never seen again. This sort of occurrence and violence was unfortunately common in this area of town where we grew up. To date we have no idea what happened to my cousin, his body has never been found. I carry the loss of my cousin, Alberto, with me everyday. I can't help but feel the guilt of this loss because I was here in Minnesota and not there to protect him.

In 2019 I was living in Mexico working near the border when the police grabbed me off the street. They said they wanted to question me at the police station but didn't tell me what I did. This a common occurrence in this area because of the cartels that are all over this part of Mexico. The police were always looking for bad people trying to do something illegal near the border. I was just trying to make some money by helping a friend drive cars to his junk yard. I guess you could say I was in the wrong place at the wrong time.

The law enforcement asked me who I was and why I was there and then said they wanted to question me further at the police station. I didn't want any trouble so I got into the vehicle with them and we drove off. There was a police officer on both sides of me, two more in the front seat and another car followed us. A short distance away, the police suddenly said to me to put my head down and not to look up. Immediately, when they said this one of the police hit me in the back my head. I complied and kept my head down but I could tell they had driven off the main road towards the river. When the truck finally stopped I noticed they pulled up in front of an old abandoned house in the woods. I was then ordered out of the truck and we walked into the house together. All the while, I was forced to keep looking at the ground and if I looked up they would hit me. I followed the men into the house and I

noticed the house had no windows, doors or a roof. I was forced into a room in the back of the house while looking at the floor the whole time. When I entered the backroom and I was shocked when I saw a dead man lying on the floor. This mans hands were tied behind his back and a plastic bag was over his head. Frighteningly, it looked like he had been dead only a short while. The men then ordered me to kneel near where the dead man was, I complied, and thought this was when I would be killed. As I was kneeling, the police ordered me to answer questions like, who I was, why I was here, and what was I doing. I immediately complied and stated that I was doing honest work but these men didn't believe me.

All the while, these men were standing over me with loaded rifles and I was beginning to feel the anxiety of some impending event. Only one man was asking the questions so I assumed this person was the leader. This man said I was doing "*something else*" and kept ordering me to admit what I was doing. All the while I was being questioned I kept begging him to not kill me and to let me go home and that I had a wife and children. My wife and children were all I could think about and I kept thinking how my death would hurt them. I was scared for my life but these men kept hitting me and asking me for answers that I did not have. After what seemed like an hour, the man who was questioning me stopped asking questions, reached into his pocket and said to me "*I have something in my pocket for you*". I noticed the man pull out a plastic bag that was coincidentally like the one that was over the head of the dead man on the floor who was just feet away from where I was kneeling. I begged and pleaded for the man not to kill me but he ignored my repeated pleas to spare my life. I was so scared at this moment that I began shaking uncontrollably which seemed to make the men laugh. I then began thinking about my mother and father, my wife, and my children. I remember thinking to myself when these men kill me will I go to heaven? I remember thinking, when I die I hope that I had done enough good things in my life so I go to heaven. I then thought about my baby brother. I last saw him when I was just five years old before that terrible car accident. I thought about what he looked like

and what I would say to him. I began to think about him so much that I almost began to embrace the death that I knew was coming. I remember thinking this was it and I hoped my family would somehow know what happened to me and maybe get my body back so they wouldn't spend a lifetime wondering what happened. The worst pain was not knowing all these years what happened to my cousin.

The man holding the bag then said this is for you and put the plastic bag over my head. The man slipped the bag over my head and I immediately began to cry and plead for my life asking him to please don't do this to me. The bag was placed only partly over my head when he stopped he asked me again for the same answers to questions I couldn't give him. Finally, when I gave him the same answers the man became angry and pulled the bag all the way over my head. I immediately began heaving for air. Sweat and tears were streaming down my face and I remember the bag was sticking to my skin and making it harder to breath every next breath. I knew I was going to die but, in the end, all I could think about was staying alive for as long as I could. I had begged for my life but these men seemed to want to kill me for something they thought I was a part of and I could do nothing to stop them. I thought about the dead man and thought this was how he died, slowly heaving for air and pleading for his life too.

In these last moments of my life I thought about what my family would do when I didn't come home and that my children would grow up without knowing what happened to their father. I remember hearing those men laughing while I was struggling to stay alive—to breath. I thought how could they just stand there and watch an innocent man die, a man with a wife and children. When all of the air was nearly gone from the bag I began to feel myself black-out. Suddenly, the man who put the bag over my head pulled the bag off and everyone became quiet. That same man began screaming and calling me a fucking liar and yelled at me to show him my tattoos? When I finally was able to speak I said to the man that I had no tattoos but he called me a fucking liar anyway. This must have enraged these men because they immediately began kicking me with the heels of their boots all over my head and face until I began to bleed profusely all over the floor and onto the dead man lying near me. I'm not sure

how much time had passed or if I lost consciousness but they suddenly stopped.

I remember noticing one of the men pulled up my shirt and looked for tattoos that I told them I didn't have. After sometime, I suddenly heard, in the background, a police radio and someone was talking in police numbered codes. Three people stayed in the house with me and the rest ran out to their truck and drove off. Of the three that stayed behind I then noticed one was a woman. When I had regained my bearings and shook off the beating somewhat they walked me back to the truck all the while ordering me to look at the ground. I continued to beg for my life because I was not sure what would happen next. As I got to the truck I remember the woman wiping my face and trying to clean my mouth so I would stop choking on the blood that was still pouring out of my mouth and down the back of my throat. One of the guys again ordered me to keep looking at the ground and said if I lift my head and saw them that it would be over. I continued to beg for my life and begged them to release me but they ignore me. After I got into the truck, we drove for what seemed like 25 minutes and when the truck stopped my heart sank. I thought to myself, this is where I was going to die? The man in the front seat said again if I didn't leave my head down then it would be over. He then ordered me to get out and walked me to the front of the truck. This man then told me to listen very closely and to not lift my head. He stated that he was going to take the handcuffs off and I was to keep looking at the ground. He then said "*when I say walk, you walk, and when I say, run, you run.*"

I replied yes sir please don't kill me. The man then came very close to my ear and whispered "*if you ever try to report this, we will find you and kill you and your family*". In my pocket I had a picture of my ID and I remember they took this out of my pocket and took a picture of it so they already knew everything they needed to find me. I knew these guys meant what they said. Then the man said "*if I ever return I will die*".

This man then removed the handcuffs and I heard a strange sound immediately after the handcuffs were removed. It was the sound of a gun being slid out of a holster and being cocked. I

thought they were going to let me go. I could barely stand after hearing this and didn't know what to think. Had they planned to shoot me regardless of what I told them? Was I still going to die? The man then said "*walk*". Many thoughts were going through my head including the thought that they would shoot me in the back. I began to walk as ordered. The man again reminded me "*don't look back or it's over.*" I kept walking and then I heard the man say "*run!*". I began to run as fast as I could for as long as I could until I was too tired from running that I collapsed on the ground and began to cry.

The truck had driven off but I was still scared that they might return so I hid in the woods for four days. I slept under the trees or where ever I thought I was safe and wouldn't be seen. When I did sleep I would wake up heaving on the blood that was still pouring out of the cuts in my mouth and down the back of my throat. I decided I would walk at night so I wouldn't be seen until I finally made it home.

After this I had told myself that I needed to get back to my wife and children in Minnesota and to get as far away from this place as possible. I had no other choice. This traumatic event haunts me everyday and there isn't a day that goes by that I don't think about what happened to me in the small border town in Mexico. To date, I have never told my wife or anyone, for that matter, about what happened to me and about that experience in Mexico when I nearly died. I don't want to tell anyone in my family because I feel like this would only poison their minds as well so I keep it inside me. I have always felt like this was my mistake and so it is my burden to bear. These traumatic events have been contributing factors in my mental, physical, and emotional state now and over the years of my life.

**2021 Traumatic Deaths Of Defendant's Mother, Pursuant to 18 U.S.C. § 3553(a)**

In November 2021, my mother passed away, due to complications from kidney failure. She was receiving dialysis weekly but the pain was excruciating. Because of the pain and my incarceration my mother became very depressed and lost her will to live. This reality I had to except, the fact that my Mother, my greatest friend, was gone while I was incarcerated and was never coming back. I will never

get the opportunity to see, talk, laugh, hug, or kiss my mother ever again. This loss hurts me everyday. I was also never allowed to attend the funeral which is a tradition in my family and culture and a way to let go of the person who has passed. I was never given the opportunity to have closure.

**Competency Evaluation, Pursuant to 18 U.S.C. § 3553(a)**

On August 11, 2022, I, Santos Gomez Perez, appeared in Court before the Honorable Judge Eric Tostrud. I presented a motion for a competency evaluation because I feel that I do not fully understand this process. My attorney never explained things to me so I could understand. I also felt I needed the evaluation because, after everything that had happened I did feel that I was experiencing a mental break down. Unfortunately, Judge Tostrud rejected my Pro Se motion for an evaluation. I still believe I need mental health help because of the grief and depression due to my experiences.

**Defendant's Positive Activity During Incarceration, Pursuant to 18 U.S.C. § 3553(a)**

I, Santoz Gomez Perez, since my arrest and arrival at the Sherburne County Jail and while awaiting disposition of my case, have made many positive adjustments. I have taken two mental health and chemical health classes;

- Mini DBT Group-10-12 week long class

- Trauma-informed (TI) Group- 8 weeks long

- Amazing Grace-Recovery Services Phase 1 through Phase 6

I have completed 564 lessons in courses such as Anger Management, Reflections and Recovery, Domestic Violence ACCI, Substance Abuse Treatment, Math, Business Law and Ethics, Plumbing and various other reentry skills training courses. These courses have resulted in over 107.78 hours of positive education and training. I have earned 62 different certificates proving that my time has been spent in constructive, meaningful self-rehabilitation and positive actions. While at Sherburne County I worked for eight months as pod worker every day 7 days a week with no problems helping staff.

**Defendant's "Hard Time" Variance ( Departure), Pursuant to 18 U.S.C. § 3553(a)**

Pursuant to the Eighth Amendment of the United States Constitution, 18 U.S.C. § 3553(a), and any other applicable law, Defendant requests a *"hard time"* variance ( downward departure) to account for the thirty three (33) months served at the Sherburne County Jail as the conditions in the Sherburne County Jail are spartan in comparison to a lower security prison.[1] See *United States v. Fiorito*, No. 07-CR-0212 (1)(PSM/SSM), 2010 U.S. Dist. Lexis 36855, at *114 (D. Minn. Apr. 14, 2010) – WL 1507645, at * 39 (D. Minn. Apr. 14, 2010); *United States v. Edmonds*, 920 F.3d 1212, 1214 (8th Cir. 2019) - No. 17-263 (DWF/DTS-1) 2019 U.S. Dist Lexis 167888, at *13 (D. Minn. Sep 30, 2019) (district Court reduced prison time for *"hard time"* served pretrial in Sherburne County Jail, crediting defendant "three months for hard time served in Sherburne County"); *United States v. Thomas*, no. 07-297(9) (DWF/JSM), 2012 WL 12896383, *1 (D. Minn. Nov., 12, 2012) (District Court granted downward variance for defendant's pretrial Custody at Sherburne County Jail)

Detainees at county jails and especially Sherburne County Jail face significantly more restrictive and harsher conditions relative to the conditions at BOP facilities. *See e.g. United States v. Taylor*, No. 18-88 (DWF/ECW), 2020 U.S. Dist. Lexis 107869, at*6 (D. Minn. June, 2020) ("acknowledging the issue commonly referred to or characterized as 'hard time' at the Sherburne County Jail or other Jail settings vis-a-vis a facility with the Bureau of Prisons")

Sherburne County Jail is not designed for long-term residence and was built for housing inmates pending trial for local and state offenses, or who have not been committed to the Department of Corrections, which is usually under a year and a day.

The Sherburne County Jail deprives inmates of certain senses amounting to sensory deprivation because there is no sunlight and no ability to go outside. Being deprived of Sun-light has a negative

---

1    Star Tribune Article 4 "Jail" Conditions Andy Mannix, Minnesota Prisoners Decry Aimless Limbo in County Jails STAR TRIBUNE, March 13, 2016 (available at http://m.startribune.calm/state-s-prisoners-decry-aimless-limbo-in-county-jail/371865301)

impact on emotional and physical health when that deprivation lasts for long periods of time.

Furthermore, due to the facilities ventilation (airflow) being so poor, it undermines sanitation. *Gibbs v. Cross*, 160 F.3d 962, 965-66 (3rd Cir. 1998), and excessive dust and lint particles further endangers the health of inmates who have asthma and allergies. Those inmates who are housed in the Sherburne County Jail are more susceptible to the adverse effects of the excessive dust and poor ventilation system, than those housed in BOP facilities or other more sanitary County Jails.

Also, Covid-19 Corona, Delta and Omicron viruses have imposed significant logistical limitation on the movement of inmates in, out, and within the Sherburne County Jail. Also, the Covid-19 pandemic, Delta and Omicron viruses has delayed the availability of in-person Court appearances and proceedings. Inmates had to be quarantine and locked in their cells or segregation 23-24 hours a day, as if they were serving time for some type of disciplinary action, for months at a time, to obviate the risk of being exposed to Covid-19 and the spreading of the deadly Corona, Delta and Omicron Viruses.

The inmates at Sherburne County Jail were being served 3 cold bag lunches a day for months at a time. This being prior to Sherburne County Jail investing in special trays and heat warming carts that would keep the food warm to allow the inmates the opportunity to receive hot meals.

Moreover, the Corona, Delta and Omicron viruses made it very difficult for inmates to keep in contact with their love ones, (families and friends), visitation at the Jail was suspended for a period of time and were only being conducted via online remote visitation. This form of visitation was a financial burden on many individuals and their family members who had to pay for the remote visits in order to see loved ones.

Lights in the inmates cells shine 24 hours a day, not letting inmates recognize night from day making it harder to sleep. *Lemaire v. Maas*, 12 F.3d 1444 (9th Cir. 1996) Constant noise (yelling/screaming/singing loudly) prevents inmates from sleeping over long periods of time. *Antonelli*

*v. Sheahan*, 81 F.3d 1422, 1433 (7ᵗʰ Cir. 1993).

I, Santos Gomez Perez am a forty-six (46) year old individual still currently in the Sherburne County Jail after 13 months. I have tested positive on December, 2021 with the Corona-virus, (infected with Covid-19, I couldn't believe it) the disease that has taken numerous lives, young and old. (I thought that I was going to die) I got so sick to the point where death would have been a blessing to me. It was one of the most horrible and painful things that I have ever experienced in all my years.

## CONCLUSION

For the reasons stated herein, the Defendant (Santos Gomez Perez) hereby respectfully prays this Court will consider the forgoing factors when deciding justifiable punishment for the Defendants breach of law. The Court is authorized to allow a variance or a departure from the Sentencing guidelines and it is the humble request of the Defendant that the Court allow a variance or (departure) based upon the content listed here to for. I, Santos Gomez Perez, prays the Court grant a variance or (departure) to account for the thirteen (13) months served in Sherburne County Jail for "*Hard Time*", to allow two (2) days for every one day spent in Sherburne County Jail, due to the spartan conditions of confinement listed above.

Respectfully Submitted,

Date: 9/11/22

Santos Gomez Perez
Santos Gomez Perez
13880 Business Center Dr, Ste 200
Elk River, MN 55330